Kim E. Miller (SBN 264409)
**KAHN SWICK & FOTI, LLP**
1901 Avenue of the Stars, 2nd Floor
Los Angeles, CA 90067
Telephone: (212) 696-3732
Email: kim.miller@ksfcounsel.com

*Counsel for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

SEAN O'HARA, RAKESH PUTHENVEETTIL, and DEBRA VON HOYNINGEN-HUENE, Individually and on Behalf of All Others Similarly Situated, on Behalf of the HP INC. 401(k) PLAN,

Plaintiffs,

v.

HP INC. and the HP PLAN COMMITTEE, and its members,

Defendants.

Case No.:

**CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ..... 1
NATURE AND SUMMARY OF THE ACTION ..... 1
JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT ..... 4
THE PARTIES ..... 4
I. Plaintiffs ..... 5
II. Defendants ..... 6
SUBSTANTIVE ALLEGATIONS ..... 7
I. The Plan ..... 7
II. Defendants Breached Their Fiduciary Duties Under ERISA ..... 9
A. Fiduciary Duties Under ERISA ..... 9
1. Duties of Prudence and Loyalty ..... 9
2. Fiduciary Liability Under ERISA ..... 10
3. Co-Fiduciary Liability Under ERISA ..... 10
4. Prohibited Transactions Under ERISA ..... 10
B. The U.S. Large Cap Has Consistently Underperformed as Compared to Meaningful Benchmarks ..... 11
1. The U.S. Large Cap and Its Benchmarks and Comparators ..... 11
2. The U.S. Large Cap's Chronic Underperformance ..... 20
C. The U.S. SMid Has Consistently Underperformed as Compared to Meaningful Benchmarks ..... 24
1. The U.S. SMid and Its Benchmarks and Comparators ..... 24
2. The U.S. SMid's Chronic Underperformance ..... 30
D. The Subject Funds Were Embedded in the Plan's Birth Date Funds, Magnifying the Harm ..... 34
E. Defendants Caused the Plan to Engage in Prohibited Transactions with a Party in Interest ..... 35
F. Defendants Violated Their ERISA Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Subject Funds ..... 38
CLASS ACTION ALLEGATIONS ..... 42
CAUSES OF ACTION ..... 45
COUNT I ..... 45
COUNT II ..... 47
COUNT III ..... 49
PRAYER FOR RELIEF ..... 51

## INTRODUCTION

1. Plaintiffs Sean O'Hara, Rakesh Puthenveettil, and Debra Von Hoyningen-Huene ("Plaintiffs"), individually, on behalf of the HP Inc. 401(k) Plan (the "Plan"), and as representatives of a class of participants and beneficiaries of the Plan, by and through their counsel, bring this Complaint for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA") against defendants HP Inc. ("HP") and the HP Plan Committee and its members (the "Investment Committee," and together with HP, the "Defendants").

2. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE AND SUMMARY OF THE ACTION

3. This is an action on behalf of the Plan, and a class of participants and beneficiaries of the Plan, against fiduciaries of the Plan arising from their breaches of fiduciary duties under ERISA.

4. ERISA requires fiduciaries of retirement plans to closely monitor investments, remove imprudent investments, make investment decisions based solely in the interests of the participants in retirement plans, and to refrain from prohibited transactions. *See* 29 U.S.C. §§ 1104(a)(1), 1106. Courts have described these duties of loyalty and prudence as "'the highest known to the law.'" *Johnson v. Couturier*, 572 F.3d 1067, 1077 (9th Cir. 2009) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

5. Here, Plaintiffs bring this action under 29 U.S.C. §§ 1132(a)(2) and (a)(3), alleging that Defendants—the Plan's fiduciaries—breached their duties by: (1) retaining underperforming investment options—(i) the U.S. Large Cap Equity Fund (the "U.S. Large Cap"); and (ii) the U.S. Small/Mid Cap Equity Fund (the "U.S. SMid," and together with the U.S. Large Cap, the "Subject Funds")—for the Plan since at least 2019, despite more suitable actively managed U.S. large-capitalization and small/mid-capitalization equity funds having been readily available; (2) causing the Plan to engage in prohibited transactions with a party in interest, in violation of 29 U.S.C. §§ 1106(a)(1)(C)–(D) and 1106(b)(1), through the Plan's recordkeeping and revenue-sharing

arrangements with Fidelity, the investment management fees paid from Plan assets in connection with the Subject Funds, the payment of Plan assets to HP itself, and the delinquent remittance of participant contributions disclosed in the Plan's filings; and (3) failing to monitor the fiduciaries responsible for administration and management of the Plan's actions in retaining the imprudent Subject Funds as investments for the Plan.

6. Defendants' breaches and imprudent investment decisions have resulted in a loss of more than $300 million in assets for the Plan and its participants—conservatively exceeding $310 million measured over the complete calendar years of the Class Period against the Comparators' averages, and approximately $480 million measured against the strongest-performing Comparator for each Subject Fund.[1]

7. The Plan is a defined contribution retirement plan under 29 U.S.C. § 1002(34) and is sponsored by HP. As evidenced by its tax-deferred qualities, the primary purpose of the Plan is to allow participants to save for retirement.

8. Defendant HP is the "sponsor" under 29 U.S.C. § 1002(16)(B) and a "named fiduciary" of the Plan.

9. The Investment Committee is the Plan's "plan administrator" and a named fiduciary for the purposes of Plan investments. As part of that process, the Investment Committee designates the investment options available under the Plan and selects the default option in which a participant's contributions are automatically invested unless the participant affirmatively elects otherwise.

10. HP, through its officers and directors, has established and maintained the Investment Committee and is responsible for appointing, monitoring, and removing its members. Through this delegation chain, HP exercises ultimate authority over the appointment, retention, and removal of the fiduciaries responsible for selecting and monitoring the Plan's investment options.

[1] The Class Period figures are the sums of the Table 3 computations, *infra*: approximately $224 million for the U.S. Large Cap and $89 million for the U.S. SMid against the Comparators' averages, and approximately $288 million and $192 million against JLPSX and TSMNX, the strongest-performing Comparator for each Fund over those years.

11. When designating the different investment options for inclusion in the Plan, Defendants were required to independently investigate and regularly monitor each of the Plan's investment options with the care and skill of a prudent investor. 29 U.S.C. § 1104(a)(1)(B).

12. Rather than acting diligently and prudently, Defendants breached their fiduciary duties by retaining the U.S. Large Cap and the U.S. SMid as investment options for the Plan from October 7, 2020 through the date of judgment (the "Class Period") despite: (i) the U.S. Large Cap having underperformed the benchmark designated in its fact sheet (the Russell 1000 Index) in nine of the eleven calendar years from 2015 through 2025, and underperformed its prospectus benchmark or peer benchmarks on a trailing three-year basis for six consecutive years (2020–2025), a trailing five-year basis for seven consecutive years (2019–2025), and a trailing ten-year basis for two consecutive years (2024–2025), and on a cumulative basis; and (ii) the U.S. SMid having underperformed the benchmark designated in its fact sheet (the Russell 2500 Index) in eight of the eleven calendar years from 2015 through 2025, and underperformed its peer benchmark (the average of the comparable funds identified below) on a trailing three-year basis (the compounded trailing measure stated in Table 2.b and described in ¶ 73, *infra*) for nine consecutive years (2017–2025), on a trailing five-year basis for five consecutive years (2021–2025), and a trailing ten-year basis for two consecutive years (2024–2025), and on a cumulative basis. The Subject Funds suffered from ongoing quantitative deficiencies resulting in massive underperformance relative to that of well-established, prudently managed, comparable funds that Defendants could have selected for the Plan.

13. The harm Defendants caused was magnified by the Plan's structure. Each of the twelve "Birth Date" Funds offered as the Plan's Tier 1 investment options—and serving as the Plan's default investment—incorporated the Subject Funds as building blocks providing underlying U.S. equity exposure.[2] As a result, participants who never directly selected a Subject Fund nevertheless suffered the Subject Funds' underperformance through the Plan's default investment.

[2] For example, the Birth Date 1975 Fund is comprised of the following funds: (i) Core Bond Fund; (ii) High Yield Bond Fund; (iii) U.S. Large Cap; (iv) Passive US Large Cap; (v) U.S. SMid; (vi) International Equity Fund; (vii) Emerging Markets Equity Fund; and (viii) Diversified Real Asset Fund.

14. Separately, throughout the Class Period, the Plan was party to recordkeeping and revenue-sharing arrangements under which Fidelity—a party in interest—provided services to the Plan in exchange for plan-asset-derived compensation, including direct recordkeeping compensation and indirect compensation in the form of sub-transfer-agency fees and revenue-sharing payments received in connection with the Plan's investments.[3] Under the Supreme Court's decision in *Cunningham v. Cornell University*, 604 U.S. 693, 700–02 (2025), these facts state *prima facie* prohibited transaction claims under 29 U.S.C. § 1106(a)(1)(C).

15. Based on Defendants' conduct, Plaintiffs bring this action on behalf of the Plan, and as representatives of a class of participants and beneficiaries of the Plan, asserting claims for a breach of the fiduciary duty of prudence (Count One), for engaging in prohibited transactions with a party in interest (Count Two), and for failure to monitor fiduciaries (Count Three). In connection with these claims, Plaintiffs seek to recover all losses to the Plan resulting from Defendants' fiduciary breaches, all profits earned by Defendants in connection with Defendants' breaches, and other appropriate relief.

## **JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT**

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1) because this action arises under 29 U.S.C. § 1132(a).

17. This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because Defendant HP maintains its principal place of business in this district, at least one of the alleged breaches took place here and the Plan is administered here.

18. Pursuant to Civil L.R. 3-2(c) and (e) and 3-5(b), this action is properly assigned to the San Jose Division because a substantial part of the events or omissions giving rise to the claims occurred in Santa Clara County, where HP maintains its principal place of business.

## **THE PARTIES**

[3] As used in this Complaint, "sub-transfer-agency fees" are payments that a mutual fund or its affiliates make to a plan's recordkeeper for maintaining the participant-level records of the plan's investment in the fund, and "revenue sharing" refers to those and other payments that a plan's recordkeeper receives from the plan's investment providers in connection with the plan's investments.

**I. Plaintiffs**

19. Plaintiffs bring this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan affected by the challenged conduct of Defendants.

20. Plaintiff Sean O'Hara was employed as an Engineer with HP from May 1994 through November 2021, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. O'Hara suffered individual injury by investing in the Plan's poorly performing Subject Funds. O'Hara was invested in the U.S. Large Cap and the U.S. SMid during the Class Period, and his account was reduced by the losses alleged herein.

21. Plaintiff Rakesh Puthenveettil was employed as a Director of Product Management with HP from March 2023 through April 2025, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Puthenveettil suffered individual injury by investing in the Plan's poorly performing Subject Funds. Puthenveettil is or was invested in the U.S. Large Cap and the U.S. SMid.

22. Plaintiff Debra Von Hoyningen-Huene was employed as a Program Manager with HP from 1996 through 2020, and was a participant in the Plan, as defined in 29 U.S.C. § 1002(7), during the Class Period. Von Hoyningen-Huene suffered individual injury by investing in the Plan's poorly performing Subject Funds. Von Hoyningen-Huene was invested in the U.S. Large Cap and the U.S. SMid, directly and as components of the Plan's Birth Date: 1960 fund, received a distribution of her entire account in 2022, and the distribution she received was reduced by the losses alleged herein.

23. As detailed *infra*, the Plan has suffered more than $300 million in losses resulting from the fiduciary breaches at issue and remains vulnerable to continuing harm. As participants in the Plan during the Class Period, Plaintiffs have standing to bring claims in a representative capacity on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2), and on behalf of all holders of funds in the Subject Funds because they suffered actual injuries to their accounts in which they held the Subject Funds during the Class Period and the alleged harms to holders of the Subject Funds can be traced to the same challenged conduct: the participants in the Plan suffered financial harm as a result of the Plan's imprudent investment options and the process Defendants used to monitor and retain the Subject

Funds. *See Vaughn v. Bay Env't Mgmt., Inc.*, 567 F.3d 1021, 1023, 1030 (9th Cir. 2009) (holding that "former employees who have received a full distribution of their account balances under a defined contribution pension plan have standing as plan participants under ERISA to recover losses occasioned by a breach of fiduciary duty that allegedly reduced the amount of their benefits"). This singular conduct with respect to the Plan harmed each of the holders of the specific funds included in the Subject Funds at issue in this action.

**II. Defendants**

24. Defendant HP Inc. is a global technology company that designs, manufactures, and sells personal computers, printers, and related products and services worldwide. HP is a Delaware corporation, and its principal place of business is located at 1501 Page Mill Road, Palo Alto, California. HP is the "sponsor" of the Plan and "named fiduciary" within the meaning of 29 U.S.C. § 1002(16)(B) and 29 U.S.C. § 1102(a). HP acts through a board of directors. HP is responsible for appointing, monitoring, retaining, and removing the members of the Investment Committee. As the entity responsible for appointing and removing members of the Investment Committee, HP had knowledge of the fiduciary breaches committed by the other Defendants, and did not make reasonable efforts under the circumstances to remedy those breaches.

25. Defendant the Investment Committee is the Plan's "plan administrator" and the named fiduciary for purposes of Plan investments. The Plan's summary plan description identifies the HP Plan Committee as the plan administrator, and the Plan's Form 5500 filings identify the plan administrator as HP. As plan administrator, the Investment Committee is a fiduciary. *See* 29 C.F.R. § 2509.75-8 at D-3. The Investment Committee is responsible for designating the investment options available under the Plan and for selecting and monitoring those investment options. It is also a "named fiduciary" within the meaning of 29 U.S.C. § 1102(a). Current and former members of the Investment Committee are fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A) because they exercised discretionary authority and/or discretionary control respecting management of the Plan. The Investment Committee has delegated at least some of its day-to-day administration of the Plan to administrators and/or trustees.

## SUBSTANTIVE ALLEGATIONS

### I. The Plan

26. The Plan is a defined contribution plan subject to the provisions of ERISA.

27. A "defined contribution" plan is a retirement plan in which an individual account is set up for each participant with benefits based upon the amount contributed to the participant's account (through employee contributions and, if applicable, employer contributions), and "any income, expenses, gains and losses." 29 U.S.C. § 1002(34).

28. The Plan is established and maintained under written documents as required by 29 U.S.C. § 1102(a).

29. Defendant HP is the "sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).

30. The Plan pays expenses from the Plan's assets, and administrative expenses are paid by participants as a reduction of investment income or through fixed per-participant recordkeeping deductions.

31. Defendants, through the Investment Committee, determined the appropriateness of the Plan's investment offerings and monitored investment performance.

32. The Plan is a participant-directed defined contribution plan, meaning participants may direct the investment of their contributions into various investment options offered by the Plan. New HP employees are automatically enrolled as participants, with a default investment in one of the Plan's Birth Date Funds corresponding to the participant's date of birth, unless the participant affirmatively elects otherwise.

33. At the choice and discretion of Defendants, various investment options were made available to the Plan's participants. The Plan's designated investment menu is organized into tiers: Tier 1 ("Complete Portfolios"), comprised of a "conservative" fund and twelve Birth Date Funds operated by SEI Trust Company; Tier 2 ("Core Active Funds"), including the Subject Funds; Tier 3 ("Core Passive Funds"), comprised of index funds; and Tier 4 ("Extended Funds"). The Subject Funds are also part of each of the Tier 1 Birth Date Funds' underlying investments.

34. Poor investment performance can significantly impair the value of a participant's account. Fiduciary decisions have the potential to dramatically affect the amount of money participants can save for retirement.

35. As of December 31, 2025, the Plan provided for retirement income for approximately 31,782 participants with account balances, comprised of HP employees, former employees, and their beneficiaries. The Plan had more participants than 99% of the defined contribution plans that filed Form 5500s for the 2023 plan year, the latest year abstracted in the Department of Labor's Private Pension Plan Bulletin (January 2026).

36. As of December 31, 2025, the Plan had approximately $10.85 billion in assets entrusted to the care of the Plan's fiduciaries, with approximately 23.3% of that amount invested in the Subject Funds. The Plan had more assets than 99.5% of the defined contribution plans that filed Form 5500s for the 2023 plan year, the latest year abstracted in the same bulletin. The table below displays the value of the assets invested in each of the Subject Funds at the end of each calendar year of the Class Period, as reported on the Plan's Form 5500 schedules of assets (in $ millions):

| **Fund** | **Dec. 31, 2020** | **Dec. 31, 2021** | **Dec. 31, 2022** | **Dec. 31, 2023** | **Dec. 31, 2024** | **Dec. 31, 2025** |
|---|---|---|---|---|---|---|
| **U.S. Large Cap** | 1,969.7 | 2,217.4 | 1,736.6 | 1,977.1 | 2,049.6 | 2,051.6 |
| **U.S. SMid** | 617.9 | 668.8 | 498.3 | 534.6 | 509.9 | 475.8 |
| **Total** | 2,587.6 | 2,886.2 | 2,235.0 | 2,511.7 | 2,559.6 | 2,527.4 |

37. The Subject Funds have been investment options in the Plan since 2015. Each Subject Fund is a collective investment trust ("CIT") within The Benefit Funds Investment Trust ("BFIT"), operated by SEI Trust Company ("SEI") as trustee, with investment advice provided by Callan LLC ("Callan").[4]

38. The Plan's recordkeeper is Fidelity Workplace Services LLC, and its affiliate Fidelity Investments Institutional Operations Company LLC receives indirect compensation in connection

[4] As used in this Complaint, a "collective investment trust" is a pooled investment fund, maintained by a bank or trust company as trustee, that is available only to participating retirement plans and their participants rather than to the public.

with the Plan's investments (collectively, "Fidelity"). Fidelity is a "party in interest" under 29 U.S.C. § 1002(14)(B) because it provides services to the Plan.

## II. Defendants Breached Their Fiduciary Duties Under ERISA

### A. Fiduciary Duties Under ERISA

#### 1. Duties of Prudence and Loyalty

39. Under ERISA, in addition to named fiduciaries, any other persons who perform fiduciary functions are treated as fiduciaries. *See* 29 U.S.C. § 1002(21)(A); 29 U.S.C. § 1102(a)(1).

40. ERISA imposes strict fiduciary duties of prudence and loyalty upon retirement plan fiduciaries. 29 U.S.C. § 1104(a). These duties apply to all fiduciary acts, including the Defendants' retention of investment options for the Plan. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

41. Importantly, the fact that participants may direct the investment of their contributions in a defined contribution plan account "does not serve to relieve a fiduciary from its duty to prudently select and monitor any…designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv).

42. Fiduciaries have "a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciaries'] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Prudence requires a review at "regular intervals." *Id.*

43. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530. If "fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) (citing *Tibble*, 575 U.S. at 529–30).

44. When considering whether to retain a U.S. equity fund as an investment option in a plan, a prudent fiduciary would evaluate the entire universe of similar funds available based on qualitative and quantitative metrics, such as trailing 3, 5 and 10-year performance relative to peer

benchmarks. Department of Labor regulations likewise direct fiduciaries to consider an investment's risk of loss and opportunity for gain "compared to the opportunity for gain…associated with reasonably available alternatives with similar risks." 29 C.F.R. § 2550.404a-1(b)(2)(i).

2. Fiduciary Liability Under ERISA

45. Under 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. Section 1109(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

3. Co-Fiduciary Liability Under ERISA

46. ERISA also imposes co-fiduciary liability where a plan fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty of another fiduciary:

1. if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
2. if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
3. if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

4. Prohibited Transactions Under ERISA

47. ERISA's prohibited-transaction provisions impose categorical bars on certain dealings between a plan and a "party in interest." Section 1106(a)(1) provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect…(C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1)(C), (D). Section 1106(b)(1) further provides that a fiduciary "shall

not…deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

48. A "party in interest" includes any "person providing services to such plan." 29 U.S.C. § 1002(14)(B).

49. The Supreme Court recently held that to plead a § 1106(a)(1)(C) violation, a plaintiff need only allege the elements of the prohibited transaction itself; the plaintiff need not anticipate and negate the affirmative defenses provided by the statutory exemptions. *Cunningham*, 604 U.S. at 700–02. After *Cunningham*, the burden of pleading and proving any applicable exemption—including the exemption in 29 U.S.C. § 1108(b)(2)(A) for reasonable arrangements with parties in interest for necessary services—rests on the defendant.

**B. The U.S. Large Cap Has Consistently Underperformed as Compared to Meaningful Benchmarks**

1. <u>The U.S. Large Cap and Its Benchmarks and Comparators</u>

50. The U.S. Large Cap has existed, and has been part of the Plan, since 2015. The Fund's investment description states it, "seeks to provide long-term growth of capital by investing in large cap stocks or sub-funds, as represented by the Russell 1000 Index." The Fund invests in U.S. large cap stocks "generally representing all broad economic sectors," and is "designed to be style neutral with the potential to tilt in either value or growth in different environments." The Fund's net expense ratio was 0.33% per its official fact sheet as of December 31, 2024 (0.350% gross, per the Plan's January 27, 2025 annual fee disclosure).

51. The benchmark designated in the U.S. Large Cap's official fact sheet is the Russell 1000 Index ("Russell 1000" or "U.S. Large Cap Prospectus Benchmark"). The fact sheet displays the Fund's performance against the Russell 1000 Index for the trailing one-, three-, five-, and seven-year periods, and for the period since the Fund's inception. Plaintiffs include data and performance comparisons against this benchmark. Additionally, the official Fidelity interface for participants to analyze the performance of their investments compares the annual performance of the U.S. Large Cap with the average annual performance of funds within the "Large Growth" "Morningstar Category"

(the "U.S. Large Cap MS Benchmark").[5] Accordingly, Plaintiffs also include data and performance comparisons against this benchmark. The Fund's official fact sheet, and the Equity StyleMap displayed on the same Fidelity interface, classify the Fund's holdings as Large Blend, while the interface's assigned Morningstar Category is Large Growth. Plaintiffs accordingly present both measures—the Blend-matched Large Cap Comparators and the Fund's designated benchmark, and the Large Growth category average that Defendants' interface places in front of participants—and, as demonstrated below, the U.S. Large Cap underperformed its designated benchmark and each of the Blend-matched Large Cap Comparators, and underperformed the Large Growth category average as well.

52. The U.S. Large Cap is a U.S.-focused large-capitalization equity fund designed to achieve long-term growth of capital through diversified, actively managed investment in U.S. large-cap equity securities. The fund is directly comparable to other actively managed, U.S.-focused large-cap equity funds offered in defined contribution plans.

53. The U.S. Large Cap is the only actively managed multi-manager[6] U.S. large-capitalization option in the Plan's designated menu. Participants who want to pursue an actively managed U.S. large-cap investment strategy through the Plan's designated menu have no choice other than to invest in the U.S. Large Cap.

---

[5] Funds are placed into a Morningstar Category based on the similarities of their holdings, portfolio statistics, and compositions over the prior three years. Morningstar describes the "Large Blend" category as including portfolios "where neither growth nor value characteristics predominate" and notes these "portfolios tend to invest across the spectrum of U.S. industries." *See* Morningstar, *Large Blend Category Definition*, *available at* https://awgmain.morningstar.com/webhelp/glossary_definitions/categories/category_Large_Blend.htm.

[6] As used in this Complaint, a "multi-manager" fund allocates its assets among two or more sub-advisors, each of which manages its portion of the fund under a separate strategy; each Subject Fund's fact sheet displays the Fund's target allocation among its sub-advisors. A "sleeve" is the portion of a multi-manager fund's assets allocated to one sub-advisor or underlying fund and managed under that manager's strategy.

54. When considering whether to retain a U.S. large-cap equity fund in a plan, a prudent fiduciary would evaluate that fund's risk and return characteristics as compared to the entire universe of comparable funds available based on qualitative and quantitative metrics.

55. All actively managed U.S.-focused large-cap equity funds are designed to achieve long-term growth of capital through primary investment in U.S. large-capitalization equity securities. As such, these funds share similar aims, similar risks—such as risk associated with the manager's selection of securities, investment style risk, and market risk arising from exposure to U.S. equity markets—and similar potential rewards.

56. Plaintiffs have identified three comparator funds for the U.S. Large Cap (the "Large Cap Comparators"). These comparator funds are offered by major market vendors and were selected based on their similar characteristics to the U.S. Large Cap—characteristics such as size, category, asset allocation, and risk ratio. Had Defendants opted to replace the U.S. Large Cap, they likely would have worked with one of the comparator funds listed.

57. Additionally, each of these comparator funds invests, as the U.S. Large Cap does, for long-term return from a broad portfolio of U.S. large-capitalization equities. Two of the Large Cap Comparators—JPMorgan US Large Cap Core Plus, whose stated goal is "a high total return from a portfolio of selected equity securities," and Principal Capital Appreciation, which "seeks to provide long-term growth of capital"—are actively managed large-cap funds; Principal Capital Appreciation is measured against the Russell 1000 Index, the U.S. Large Cap's designated benchmark, and JPMorgan US Large Cap Core Plus against the S&P 500 Index, an exposure near-identical to it. The third, DFA US Large Company, is a low-cost index fund that seeks to approximate the total investment return of the S&P 500 Index by investing in the large U.S. companies comprising that index.[7] That DFUSX pursues its large-cap mandate through index replication while the U.S. Large

[7] The S&P 500 Index and the Russell 1000 Index are near-identical large-capitalization exposures. For example, as of June 30, 2026, the index funds tracking them reported the indexes' trailing three-year annualized total returns as 20.59% (S&P 500) and 20.44% (Russell 1000)—a spread of fifteen basis points—and, as of July 31, 2026, the funds' trailing three-year standard deviations as approximately 13.06 and 13.20, respectively. Further, the monthly returns of the leading

Cap does so through active multi-manager allocation does not undermine the comparison—it sharpens it, because DFUSX is an investable form of an index near-identical to the U.S. Large Cap's designated benchmark, available to any plan fiduciary at a fraction of the Fund's cost. The Ninth Circuit has required a plaintiff pleading imprudence through performance comparisons to provide "a sound basis for comparison—a meaningful benchmark"—that is, funds or investments that are "meaningfully similar" to the challenged fund, with comparable aims, risks, and potential rewards. *Anderson v. Intel Corp. Inv. Policy Comm.*, 137 F.4th 1015, 1022–23 (9th Cir. 2025), *cert. granted*, No. 25-498 (U.S. Jan. 16, 2026) (argued Oct. 6, 2026). The Large Cap Comparators satisfy that standard, and any less demanding one. Plaintiffs have selected the following comparator funds for the U.S. Large Cap:

| Fund | Large Cap Comparators[8] |
|---|---|
| **U.S. Large Cap** | DFA US Large Company I ("DFUSX") |
| | JPMorgan US Large Cap Core Plus I ("JLPSX") |
| | Principal Capital Appreciation Inst ("PWCIX") |

58. The Large Cap Comparators are mainstream institutional funds offered by established asset managers, and, as demonstrated below, they are "meaningfully similar" (*Anderson*, 137 F.4th at 1023) to the U.S. Large Cap across each dimension examined below: the U.S. Large Cap and the Large Cap Comparators hold similar asset allocations, deploy their equity in the same markets and the same sectors, share the same Morningstar investment style, and carry comparable risk profiles. Performance differences between funds so aligned reflect the quality of investment management.

59. A critical threshold for establishing that two equity funds are meaningfully comparable is demonstrating that they maintain similar overall allocations to equities. Equity allocation is a principal driver of a fund's risk-return profile: funds with higher equity allocations are expected to generate higher long-term returns with greater short-term volatility, while funds holding meaningful

exchange-traded funds tracking the two indexes have correlated at approximately 1.00 for as long as both have existed.

[8] The term "Large Cap Comparators" as used herein refers collectively to: (1) DFUSX, (2) JLPSX, and (3) PWCIX.

bond or cash positions sacrifice return potential for stability. Funds with similar equity allocations are, by definition, taking on similar levels of market risk and targeting a similar risk-return tradeoff for their investors. The U.S. Large Cap and each of the Large Cap Comparators invest substantially all of their assets in equities, and deploy that equity overwhelmingly in U.S. markets:[9]

**U.S. Large Cap vs. Large Cap Comparators: Asset Allocation**

| Asset Class | U.S. Large Cap | DFUSX | JLPSX | PWCIX | Comp. Avg. | Fund vs. Avg. |
|---|---|---|---|---|---|---|
| **U.S. Stock** | 93.39 | 97.62 | 96.50 | 95.19 | 96.44 | -3.05 |
| **Non-U.S. Stock** | 5.73 | 0.49 | 2.25 | 3.83 | 2.19 | +3.54 |
| **Total Equity** | 99.12 | 98.11 | 98.75 | 99.02 | 98.63 | +0.49 |
| **Bonds** | 0.00 | 0.00 | 0.00 | 0.19 | 0.06 | -0.06 |
| **Cash** | 0.87 | 1.89 | 1.25 | 0.79 | 1.31 | -0.44 |

60. As shown above, the U.S. Large Cap's total equity allocation (approximately 99.12%) is within approximately 0.5 percentage points of the Large Cap Comparators' average (approximately 98.63%), and every fund in the comparison holds approximately 98% to 99% of its assets in equities, with only incidental bond and cash positions. The funds are likewise aligned geographically: each invests approximately 93% or more of its assets in U.S. stocks, and the U.S. Large Cap's non-U.S. stock position (approximately 5.73%) is within approximately 3.5 percentage points of the comparator average (approximately 2.19%). These funds are investing in the same markets, in similar proportions, for similar purposes. Because of these similarities, the U.S. Large Cap and the Large Cap Comparators also share the same risks, including risks associated with the manager's selection of securities, and investment style risk.

61. Beyond overall asset allocation, the comparability of equity funds can be evaluated by examining the sectors in which each fund's equity portfolio is invested. Sector exposure reveals where a fund's equity capital is deployed across the economy (Technology, Financial Services,

[9] The U.S. Large Cap's allocation figures are as displayed on the Plan's Fidelity NetBenefits fund research pages as of March 31, 2026; the Large Cap Comparators' are Morningstar's as of June 30, 2026. "Comp. Avg." is the simple average of the Comparators' figures, and "Fund vs. Avg." is the Subject Fund's figure less the displayed average; the same convention applies to each "Fund vs. Avg." column below. Morningstar's allocation figures are net of short positions; JLPSX, a "core plus" strategy, holds short positions (approximately 21–22% of net assets in its recent fact sheets) while maintaining approximately 100% net long equity exposure, per its prospectus.

Healthcare, Industrials, and so forth). Funds with similar sector exposures are, by definition, exposed to similar industry-specific risks and opportunities, and their returns can be expected to respond similarly to sector-level economic events. The U.S. Large Cap's equity is deployed across the same eleven sectors as the Large Cap Comparators', with Technology the largest sector for every fund and ten of the eleven sectors within approximately 2.7 percentage points of the Large Cap Comparators' average:[10]

**U.S. Large Cap vs. Large Cap Comparators: Sector Allocations**

| Sector | U.S. LC | DFUSX | JLPSX | PWCIX | Comp. Avg. | Fund vs. Avg. |
|---|---|---|---|---|---|---|
| **Technology** | 30.71 | 38.10 | 34.78 | 36.77 | 36.55 | -5.84 |
| **Financial Services** | 13.24 | 11.77 | 11.52 | 12.25 | 11.85 | +1.39 |
| **Healthcare** | 12.06 | 8.90 | 9.18 | 10.17 | 9.42 | +2.64 |
| **Comm. Services** | 11.27 | 9.70 | 8.66 | 9.85 | 9.40 | +1.87 |
| **Consumer Cyclical** | 9.95 | 9.32 | 11.52 | 9.64 | 10.16 | -0.21 |
| **Industrials** | 9.23 | 8.81 | 10.83 | 9.14 | 9.59 | -0.36 |
| **Energy** | 4.06 | 2.98 | 3.20 | 3.12 | 3.10 | +0.96 |
| **Consumer Defensive** | 3.75 | 4.57 | 2.51 | 3.50 | 3.53 | +0.22 |
| **Utilities** | 2.07 | 2.19 | 4.40 | 1.61 | 2.73 | -0.66 |
| **Basic Materials** | 2.05 | 1.83 | 1.63 | 1.84 | 1.77 | +0.28 |
| **Real Estate** | 1.61 | 1.80 | 1.80 | 2.10 | 1.90 | -0.29 |

62. The data reveals a striking degree of sector-level consistency. In ten of the eleven sectors, the difference between the U.S. Large Cap's allocation and the Large Cap Comparators' average is less than approximately 2.7 percentage points, and the largest difference is in Technology, at under six percentage points. Technology is the largest sector allocation for the U.S. Large Cap and for every Large Cap Comparator, followed in each case by the same cluster of sectors—Financial Services, Healthcare, Communication Services, Consumer Cyclical, and Industrials—confirming that all four funds are similarly positioned to benefit from, or be affected by, movements in the same segments of the economy. These are funds that are fishing in the same waters. Performance differences among them therefore reflect the skill with which each manager selects and weights securities within those sectors, not differences in the sectors chosen.

[10] The U.S. Large Cap's sector allocations are as displayed on the Plan's Fidelity NetBenefits fund research pages as of March 31, 2026; the Large Cap Comparators' are the sector weightings reported on their Morningstar-provided fund profiles as of June 30, 2026, restated under the sector names used for the Subject Funds.

63. The Morningstar Equity Style Box is a widely recognized analytical tool that classifies a fund's equity holdings along two dimensions: market capitalization (Large, Mid, or Small) and investment style (Value, Blend, or Growth), producing a grid of nine possible classifications. Funds classified in the same box are pursuing the same fundamental equity strategy—investing in stocks of similar size and similar growth/value orientation. Here, the Fund's holdings-based style placement and every Large Cap Comparator's Morningstar category coincide: Large Blend. The style map published in the U.S. Large Cap's official fact sheet places the Fund's holdings in the Large/Blend box—and only that box—consistent with the Fund's stated "style neutral" design, and the participant-facing style map displayed on the Plan's Fidelity interface likewise classifies the Fund as "Large Blend" (a classification covering 99.11% of Fund assets), although the Morningstar Category the interface assigns the Fund is Large Growth (¶ 51, *supra*). Each of the three Large Cap Comparators is placed by Morningstar in the Large Blend category. This alignment refutes any suggestion that performance differences between the U.S. Large Cap and the Large Cap Comparators are attributable to differences in investment style: these funds hold the same types of stocks—large, diversified U.S. companies spanning value and growth orientations—and performance differences among them are most plausibly explained by differences in the quality of security selection and portfolio management.

64. Finally, a meaningful comparison requires that the comparator funds carry comparable risk, so that performance differences can be attributed to management quality. A fund that takes less risk can be expected to earn less; a fund that takes the same risk and earns less has been managed worse. Standard deviation is the foundational statistical measure used in investment analysis to quantify risk: it measures how much an investment's returns vary from its average return over a given period. A higher standard deviation means the investment's returns fluctuate more widely; a lower standard deviation means returns are more stable and predictable. If two funds have similar standard deviations, they expose their investors to similar levels of volatility. Standard deviation is universally reported by fund rating services, including Morningstar, and the Subject Funds' standard deviations are displayed to participants on the Plan's Fidelity interface.

65. The U.S. Large Cap and the Large Cap Comparators carry comparable levels of risk. The U.S. Large Cap's standard deviation, as displayed to Plan participants, is approximately 12.67.[11] The Large Cap Comparators' trailing three-year standard deviations are approximately 13.05 (DFA US Large), 13.44 (JPM Core Plus), and 13.10 (Principal Capital)—an average of approximately 13.20, within 0.53 percentage points of the U.S. Large Cap's figure. All four funds cluster within a band of less than one percentage point, and the Large Cap Comparators' longer-horizon standard deviations are just as tightly grouped (approximately 15.17 to 15.43 on a trailing five-year basis, and approximately 14.87 to 15.47 on a trailing ten-year basis). Notably, the U.S. Large Cap's Sharpe ratio (approximately 0.99)—the standard measure of return delivered per unit of risk—is no higher than any Large Cap Comparator's (approximately 1.07, 1.04, and 0.99, respectively) and below their average (approximately 1.03). The Fidelity interface also reports the U.S. Large Cap's beta at approximately 0.95 and its $R^2$ at approximately 0.98—meaning the Fund's returns move essentially in lockstep with its designated Russell 1000 benchmark, and confirming that comparisons to that benchmark, and to comparator funds managed against the same segment of the market, are apples-to-apples.

66. The risk data thus leaves no room for the most common defense of a chronically underperforming fund: that it simply took less risk. The U.S. Large Cap carried substantially the same risk as the Large Cap Comparators and tracked its designated benchmark almost perfectly—yet, as demonstrated below, it delivered materially lower returns year after year. The U.S. Large Cap was not underperforming because it took less risk; it underperformed while assuming the same risk, which is the hallmark of deficient investment management.

67. The Large Cap Comparators are particularly appropriate comparators in the context of a defined contribution retirement plan because they occupy the same role within a plan's investment

[11] The U.S. Large Cap's volatility measures (standard deviation, Sharpe ratio, beta, and $R^2$) are as displayed to participants on the Plan's Fidelity NetBenefits interface as of June 30, 2026. The Large Cap Comparators' standard deviations and Sharpe ratios are Morningstar's trailing three-year figures, and their five- and ten-year standard deviations Zacks Investment Research's, each as reported in August 2026.

lineup—namely, broad U.S. large-cap equity options intended to provide participants with long-term equity strategies.

68. The Large Cap Comparators are all institutional share-class mutual funds that pursue materially similar mandates and invest in the same segment of the U.S. equity market as the U.S. Large Cap. Accordingly, the Large Cap Comparators represent meaningful peer funds against which a prudent fiduciary would evaluate whether the U.S. Large Cap delivered competitive performance and value for the Plan's participants. The returns compared in this Complaint are stated net of each fund's expenses, so any difference in cost between the U.S. Large Cap and the Large Cap Comparators is already reflected in every performance figure that follows.

69. That the U.S. Large Cap is a collective investment trust maintained within BFIT for the Plan—"an institutional collective investment trust, not a mutual fund," as its fact sheet states—while the Large Cap Comparators are institutional share classes of publicly offered mutual funds, does not undermine the comparison. The comparability analysis set forth above rests on the funds' actual portfolio compositions—their asset allocations, sector exposures, investment styles, and risk profiles—and on the returns each fund delivered, and the vehicle through which a strategy is offered changes none of them. Morningstar reports the same measures for collective investment trusts and mutual funds alike, and the Plan's Fidelity interface presents the U.S. Large Cap to participants on those measures, as it presents a mutual fund (¶¶ 51, 63–65 and notes 9–11, *supra*).[12] Plan fiduciaries routinely evaluate collective investment trusts and mutual funds side by side when constructing plan lineups. The Russell 1000 Index and the U.S. Large Cap MS Benchmark are presented in Tables 1.a, 1.c, and 1.d, *infra*, as measures of comparative performance only; the comparator averages and the loss figures in this Complaint use the Large Cap Comparators.

70. Based on the similarities of the Large Cap Comparators' investment objectives, similar investment styles, portfolio construction approaches, and risks, the Large Cap Comparators represent

---

[12] Nor does the Fund's multi-manager construction distinguish it. Each of its sub-advisors manages a U.S. large-cap equity mandate, and the resulting portfolio is a single diversified U.S. large-cap portfolio that both its fact sheet and the Plan's Fidelity interface place in Large Blend.

meaningful comparators to the U.S. Large Cap. When combined with the Fund's designated benchmark (the Russell 1000 Index) and the Large Cap MS Benchmark, Plaintiffs have identified meaningful benchmarks that provide a sound basis of comparison to the U.S. Large Cap. Indeed, as demonstrated above, the U.S. Large Cap and the Large Cap Comparators hold similar asset allocations, deploy their equity in the same markets and the same sectors, occupy the same Morningstar style classification, and carry comparable risk—comparable aims, comparable risks, and comparable potential rewards. *See also* Appendix A.

2. The U.S. Large Cap's Chronic Underperformance

71. As detailed below, the U.S. Large Cap has significantly underperformed both its designated benchmarks and its peer Large Cap Comparators on an annual basis, on a trailing 3-year, 5-year, and 10-year basis, and on a cumulative basis.

72. The U.S. Large Cap's underperformance has undermined the retirement savings of participants in the Plan since at least 2019.[13] Table 1.a below illustrates the U.S. Large Cap's performance as compared to its designated benchmarks based on: (i) yearly returns for the years 2015–2025;[14] (ii) compounded annual differences over trailing three-year windows ending 2017–

[13] The underperformance appears on the face of the Fund's disclosures. The U.S. Large Cap's official fact sheet as of December 31, 2024 reports the Fund trailing the Russell 1000 Index over every trailing period presented: (i) 18.1% versus 24.5% over the trailing one-year period; (ii) 7.2% versus 8.4% (annualized) over the trailing three-year period; (iii) 13.0% versus 14.3% over the trailing five-year period; (iv) 12.3% versus 13.6% over the trailing seven-year period; and (v) 13.1% versus 13.8% since November 1, 2015 (the first full month after the Fund's October 12, 2015 inception). As of June 30, 2026, the Plan's participant-facing Fidelity interface likewise reported the Fund trailing the Russell 1000 Index over the trailing one-year (17.30% vs. 22.01%), three-year (17.41% vs. 20.47%), five-year (10.18% vs. 12.66%), and ten-year (14.72% vs. 15.29%) periods and over the life of the Fund (13.48% vs. 14.11%). Over no trailing period of one year or longer ending on the date of either disclosure has the Fund outperformed its designated benchmark.

[14] The Subject Funds' official fact sheets state a fund inception date of October 12, 2015; the Plan's Fidelity interface reports an inception date of December 31, 2010 for each Subject Fund (with a share-class inception in October 2015) and, as captured on November 20, 2025, displayed full calendar-year 2015 figures for each Fund and its benchmarks, which are the 2015 figures pleaded here. Per the Plan's annual fee disclosure, the performance history of the Plan's collective investment trust funds includes that of the corresponding institutional fund under the legacy HP 401(k) Plan, and HP has determined that the effect of not adjusting that history for the fees of the current collective investment trust structure is no more than 0.051% in either direction.

2025; (iii) trailing five-year windows ending 2019–2025; and (iv) trailing ten-year windows ending 2024–2025:

73. In the tables that follow, the rows captioned "Trailing 3," "Trailing 5," and "Trailing 10" state the cumulative compounded value of the annual Alpha or Delta figures (the Fund's return less the benchmark's, or less the Comparators' average) over the trailing window ending in the indicated year—a measure of the persistence and accumulation of those annual gaps, distinct from the difference between the funds' cumulative compounded returns, which Tables 1.c and 2.c state separately. Comparator averages are presented alongside each Comparator's individually stated figures, which appear in Tables 1.a through 2.d. In the annual columns, the comparator average is the average of the Comparators' returns for that year—the return of an investment divided equally among the Comparators; in Tables 1.c and 2.c, it is the average of the Comparators' cumulative compounded returns.

Table 1.a
**U.S. Large Cap**
Annual and 3-Year, 5-Year, and 10-Year Compounded Trailing Differences vs. Large Cap Prospectus Benchmark & Large Cap MS Benchmark[15]

| **Fund / Bench** | **Annual Performance** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **US Large** | 0.62 | 11.13 | 25.35 | -4.81 | 28.42 | 19.48 | 25.13 | -17.06 | 25.70 | 18.12 | 15.18 |
| Russell 1000 | 0.92 | 12.05 | 21.69 | -4.78 | 31.43 | 20.96 | 26.45 | -19.13 | 26.53 | 24.51 | 17.37 |
| *Alpha* | -0.30 | -0.92 | 3.66 | -0.03 | -3.01 | -1.48 | -1.32 | 2.07 | -0.83 | -6.39 | -2.19 |
| **Trailing 3** | - | - | 2.40 | 2.68 | 0.51 | -4.47 | -5.71 | -0.77 | -0.11 | -5.25 | -9.20 |
| **Trailing 5** | - | - | - | - | -0.71 | -1.89 | -2.28 | -3.78 | -4.55 | -7.88 | -8.54 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -8.54 | -10.27 |
| MS Bench | 3.60 | 3.23 | 27.67 | -2.09 | 31.90 | 35.86 | 20.45 | -29.91 | 36.74 | 28.96 | 16.10 |
| *Alpha* | -2.98 | 7.90 | -2.32 | -2.72 | -3.48 | -16.38 | 4.68 | 12.85 | -11.04 | -10.84 | -0.92 |
| **Trailing 3** | - | - | 2.26 | 2.53 | -8.28 | -21.49 | -15.51 | -1.22 | 5.09 | -10.49 | -21.41 |
| **Trailing 5** | - | - | - | - | -3.99 | -17.25 | -19.72 | -7.25 | -15.18 | -21.65 | -7.16 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -24.77 | -23.18 |

15 Unless stated otherwise, all numerical figures in charts throughout this Complaint represent percentage values (%). Negative differences from a benchmark or Comparator average are shown in red in the performance tables (Tables 1.a through 2.d).

74. Table 1.b below illustrates the U.S. Large Cap's underperformance as compared to the Large Cap Comparators based on: (i) yearly returns for the years 2015–2025; (ii) compounded annual differences over trailing three-year windows ending 2017–2025; (iii) trailing five-year windows ending 2019–2025; and (iv) trailing ten-year windows ending 2024–2025:

Table 1.b
**U.S. Large Cap**
Annual and 3-Year, 5-Year, and 10-Year Compounded Trailing Differences vs. LC Comparators

| **Fund** | **Annual Performance** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **U.S. Large** | 0.62 | 11.13 | 25.35 | -4.81 | 28.42 | 19.48 | 25.13 | -17.06 | 25.70 | 18.12 | 15.18 |
| DFUSX | 1.38 | 11.90 | 21.73 | -4.43 | 31.42 | 18.40 | 28.60 | -18.19 | 26.25 | 24.91 | 17.76 |
| JLPSX | -0.27 | 9.80 | 21.48 | -7.24 | 29.78 | 26.17 | 29.20 | -18.50 | 29.82 | 28.93 | 14.83 |
| PWCIX | 2.41 | 9.25 | 21.07 | -3.15 | 32.69 | 18.81 | 27.95 | -16.12 | 25.42 | 26.22 | 13.53 |
| *Delta* | -0.55 | 0.81 | 3.92 | 0.13 | -2.88 | -1.65 | -3.45 | 0.54 | -1.46 | -8.57 | -0.19 |
| **Trailing 3** | - | - | 4.19 | 4.90 | 1.07 | -4.35 | -7.77 | -4.53 | -4.35 | -9.42 | -10.08 |
| **Trailing 5** | - | - | - | - | 1.32 | 0.21 | -4.03 | -7.15 | -8.63 | -13.98 | -12.71 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -12.85 | -12.53 |

75. Table 1.c below illustrates the U.S. Large Cap's cumulative compounded performance as compared to the Large Cap Comparators and its designated benchmark:

Table 1.c
**U.S. Large Cap**
Cumulative Compounded Performance vs. the Large Cap Comparators, Large Cap Prospectus Benchmark & Large Cap MS Benchmark

| **Fund / Benchmark** | **Cumulative Compounded Performance 2015–2025** | |
|---|---|---|
| | Cumulative Compound Performance | Underperformance vs. Comparator |
| **U.S. Large Cap** | 263.35 | N/A |
| DFUSX | 301.23 | -37.88 |
| JLPSX | 308.91 | -45.56 |
| PWCIX | 298.93 | -35.58 |
| ***Comparator Average*** | 303.02 | -39.67 |
| Russell 1000 | 293.89 | -30.54 |
| MS Bench | 314.06 | -50.71 |

76. The consistency of the underperformance is as striking as its magnitude. Table 1.d below states the record comparator by comparator: (i) for each Large Cap Comparator and each benchmark, the compounded difference between the Fund's returns and the comparison's over the trailing three-, five-, and ten-year windows ending December 31, 2025; (ii) the number of the eighteen trailing windows computable from the returns pleaded in Tables 1.a and 1.b on which the Fund underperformed the comparators or benchmarks; and (iii) the same count for the fourteen windows ending in the Class Period (2020 through 2025). On the compounded basis stated above, JLPSX and the Fund's designated Russell 1000 benchmark outperformed the Fund on all fourteen Class Period windows, and DFUSX, PWCIX, the Comparators' average, and the Large Growth category average outperformed it on thirteen of the fourteen. At the start of the Class Period, on the windows ending December 31, 2020, the Russell 1000 and JLPSX were already ahead of the Fund on both the three- and five-year windows, and the Comparators' average on the three-year window. As of December 31, 2025, every Large Cap Comparator, their average, and both benchmarks are ahead of the Fund on every trailing window. A fund that trails its designated benchmark and its strongest-performing peer on every standard window across six consecutive year-ends is chronically underperforming.

Table 1.d
**U.S. Large Cap**
Trailing 3-Year, 5-Year, and 10-Year Compounded Annual Differences as of December 31, 2025, and Windows Underperformed, vs. LC Comparators, Comparator Average, and Each Benchmark

| Comparator / Benchmark | Trailing 3 (2025) | Trailing 5 (2025) | Trailing 10 (2025) | Windows underperformed | Windows underperformed (20–25) |
|---|---|---|---|---|---|
| DFUSX | -9.69 | -11.84 | -11.46 | 14 of 18 | 13 of 14 |
| JLPSX | -14.19 | -16.49 | -17.14 | 14 of 18 | 14 of 14 |
| PWCIX | -6.32 | -9.82 | -9.20 | 15 of 18 | 13 of 14 |
| ***Comparator Average*** | -10.08 | -12.71 | -12.53 | 13 of 18 | 13 of 14 |
| Russell 1000 | -9.20 | -8.54 | -10.27 | 15 of 18 | 14 of 14 |
| MS Bench | -21.41 | -7.16 | -23.18 | 15 of 18 | 13 of 14 |

77. The assets in the U.S. Large Cap have an approximate value of $2.05 billion (as of December 31, 2025). Assuming, for illustrative purposes only, that the approximately $2.05 billion in assets reflects compound growth on a single starting principal, and given that the U.S. Large Cap produced cumulative compounded growth of 263.35% from 2015 through 2025, the original amount in 2015 would have been approximately $564.6 million. Had $564.6 million been invested in one of

the Large Cap Comparators, its value as of December 31, 2025, would have been, on average, approximately $2.276 billion (or an increase in value for participants of approximately $224 million). That illustration measures the shortfall over the full period of the pleaded returns. The losses Plaintiffs seek to recover, measured from the first full calendar year of the Class Period, are in Table 3 below.

78. The foregoing return, trailing return, and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the U.S. Large Cap and compared its performance to any of the Large Cap Comparators, or even its designated benchmark.

79. A prudent fiduciary monitoring the U.S. Large Cap's performance would have compared its returns to one or more of the Large Cap Comparators identified in Tables 1.b and 1.c or, at minimum, to its prospectus benchmark and the additional Morningstar Category benchmark identified in participant-facing disclosures.

80. When considering whether to retain a U.S. large-cap equity fund in a plan, a prudent fiduciary would evaluate the fund's risk and return characteristics relative to the entire universe of comparable funds, using qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the U.S. Large Cap was appropriate for the Plan.

**C. The U.S. SMid Has Consistently Underperformed as Compared to Meaningful Benchmarks**

1. The U.S. SMid and Its Benchmarks and Comparators

81. The U.S. SMid has existed, and has been part of the Plan, since 2015. The Fund's investment objective "seeks to provide long-term capital appreciation by investing in small/mid cap stocks, as represented by the Russell 2500 Index." The Fund invests in U.S. small- and mid-capitalization stocks diversified across both growth and value styles, and is designed to be style neutral. The Fund's net expense ratio was 0.48% per its official fact sheet as of December 31, 2024 (0.540% gross, per the Plan's January 27, 2025 annual fee disclosure).

82. The benchmark designated in the U.S. SMid's official fact sheet is the Russell 2500 Index ("Russell 2500" or "SMid Prospectus Benchmark"). The fact sheet displays the Fund's performance against the Russell 2500 Index for the trailing one-, three-, five-, and seven-year periods,

and for the period since the Fund's inception. Plaintiffs include data and performance comparisons against this benchmark. Additionally, the official Fidelity interface for participants to analyze the performance of their investments compares the annual performance of the U.S. SMid with the average annual performance of funds within the "Mid-Cap Growth" Morningstar Category (the "SMid MS Benchmark"). Accordingly, Plaintiffs also include data and performance comparisons against this benchmark. The Fund's official fact sheet, and the Equity StyleMap displayed on the same Fidelity interface, classify the Fund's holdings in the Blend column of the style grid (Small/Mid Blend), while the interface's assigned Morningstar Category is Mid-Cap Growth. Plaintiffs accordingly present both measures—the SMid Comparators and the Fund's designated benchmark, and the Mid-Cap Growth category average that Defendants' interface places in front of participants—and the U.S. SMid's underperformance of its designated benchmark and of the SMid Comparators does not depend on which classification is applied.

83. The U.S. SMid is a U.S.-focused small- and mid-capitalization equity fund designed to achieve long-term capital appreciation through diversified, actively managed investment in U.S. small- and mid-cap equity securities. The Fund is directly comparable to other actively managed, U.S.-focused small/mid-cap equity funds offered in defined contribution plans.

84. The U.S. SMid is the only actively managed multi-manager U.S. small/mid-capitalization option in the Plan's designated menu. Participants who want to pursue an actively managed U.S. small/mid-cap investment strategy through the Plan's designated menu have no choice other than to invest in the U.S. SMid.

85. All actively managed U.S.-focused small/mid-cap equity funds are designed to achieve long-term capital appreciation through primary investment in U.S. small- and mid-capitalization equity securities. As such, these funds share similar aims, similar risks—including risk associated with the manager's selection of securities, investment style risk, the greater volatility of small- and mid-cap stocks relative to large-cap stocks, and market risk arising from exposure to U.S. equity markets—and similar potential rewards.

86. Plaintiffs have identified three comparator funds for the U.S. SMid (the "SMid Comparators," and together with the Large Cap Comparators, the "Comparators"). These comparator funds are offered by major market vendors and were selected based on their similar characteristics to the U.S. SMid—characteristics such as size, category, asset allocation, and risk ratio. Each of the three SMid Comparators is an actively managed fund that designates or uses the same Russell 2500 Index that the U.S. SMid designates as its benchmark. And each, like the U.S. SMid, invests across the value and growth segments of the small/mid-cap market: PGIM Jennison Small Company's subadviser "uses a blend of both value and growth styles," Nuveen Quant Small/Mid Cap Equity invests "across a wide range of sectors, growth rates and valuations," and Morningstar classifies Eaton Vance Atlanta Capital SMID-Cap as Mid-Cap Blend. Had Defendants opted to replace the U.S. SMid, they likely would have worked with one of the comparator funds listed. Like the Large Cap Comparators, the SMid Comparators are "meaningfully similar" to the U.S. SMid, with comparable aims, risks, and potential rewards. *See Anderson*, 137 F.4th at 1023. Plaintiffs have selected the following comparator funds for the U.S. SMid:

| **Fund** | **SMid Comparators**[16] |
|---|---|
| **U.S. SMid** | Eaton Vance Atlanta Capital SMID-Cap I ("EISMX") |
| | PGIM Jennison Small Company Z ("PSCZX") |
| | Nuveen Quant Small/Mid Cap Eq I ("TSMNX") |

87. The SMid Comparators, likewise, are mainstream institutional funds, and they are "meaningfully similar" (*Anderson*, 137 F.4th at 1023) to the U.S. SMid across the same dimensions demonstrated above for the U.S. Large Cap: asset allocation, U.S. and non-U.S. equity exposure, sector allocation, investment style, and risk profile.

88. Like the U.S. SMid, each SMid Comparator invests substantially all of its assets in U.S. equities:[17]

---

[16] The term "SMid Comparators" as used herein refers collectively to: (1) EISMX, (2) PSCZX, and (3) TSMNX.

[17] The U.S. SMid's allocation figures are as displayed on the Plan's Fidelity NetBenefits fund research pages as of March 31, 2026; the SMid Comparators' are Morningstar's as of June 30, 2026. Morningstar's composition breakdown for EISMX reports no foreign-stock line, shown here as zero.

**U.S. SMid vs. SMid Comparators: Asset Allocation**

| Asset Class | U.S. SMid | EISMX | PSCZX | TSMNX | Comp. Avg. | Fund vs. Avg. |
|---|---|---|---|---|---|---|
| **U.S. Stock** | 97.71 | 98.19 | 92.95 | 95.82 | 95.65 | +2.06 |
| **Non-U.S. Stock** | 1.50 | 0.00 | 4.60 | 4.11 | 2.90 | -1.40 |
| **Total Equity** | 99.21 | 98.19 | 97.55 | 99.93 | 98.56 | +0.65 |
| **Bonds** | 25.38 | 0.00 | 0.00 | 0.00 | 0.00 | +25.38 |
| **Cash** | -24.60 | 1.81 | 2.44 | 0.06 | 1.44 | -26.04 |

89. As shown above, the U.S. SMid's total equity allocation (approximately 99.21%) is within approximately 0.7 percentage points of the SMid Comparators' average (approximately 98.56%), and every fund in the comparison holds approximately 97% or more of its assets in equities. Each fund likewise deploys the overwhelming share of its equity in U.S. markets: the U.S. SMid holds approximately 97.71% of its assets in U.S. stocks, within approximately 2.1 percentage points of the comparator average (approximately 95.65%). The U.S. SMid's reported bond positions (approximately 25.38% in the aggregate) and offsetting negative cash position (approximately -24.60%) are the accounting footprint of the Fund's approximately 20% allocation to the PIMCO StocksPLUS® Small Fund, which—per the U.S. SMid's fact sheet—obtains small-cap equity exposure through "equity-linked instruments," such as index futures, layered over a bond portfolio. Economically, that sleeve functions as U.S. small-cap equity exposure, and the U.S. SMid's total equity allocation is in line with the SMid Comparators'. Because of these similarities, the U.S. SMid and the SMid Comparators share the same risks, including risks associated with the manager's selection of securities, and investment style risk.

90. The U.S. SMid's equity is likewise deployed across the eleven sectors, its allocation within approximately 3.3 percentage points of the SMid Comparators' average in every one of them:[18]

[18] The U.S. SMid's sector allocations are as displayed on the Plan's Fidelity NetBenefits fund research pages as of March 31, 2026; the SMid Comparators' are the sector weightings reported on their Morningstar-provided fund profiles as of June 30, 2026, restated under the sector names used for the Subject Funds. Morningstar's breakdown for EISMX reports no Energy, Utilities, or Communication Services line; those sectors are treated as zero in computing the comparator average.

**U.S. SMid vs. SMid Comparators: Sector Allocations**

| Sector | U.S. SMid | EISMX | PSCZX | TSMNX | Comp. Avg. | Fund vs. Avg. |
|---|---|---|---|---|---|---|
| **Industrials** | 20.55 | 29.13 | 20.14 | 20.62 | 23.30 | -2.75 |
| **Technology** | 17.14 | 15.92 | 16.04 | 18.19 | 16.72 | +0.42 |
| **Financial Services** | 15.02 | 21.55 | 17.46 | 15.81 | 18.27 | -3.25 |
| **Healthcare** | 14.43 | 4.40 | 14.60 | 14.29 | 11.10 | +3.33 |
| **Consumer Cyclical** | 12.58 | 14.35 | 9.85 | 10.92 | 11.71 | +0.87 |
| **Energy** | 5.91 | 0.00 | 5.75 | 3.24 | 3.00 | +2.91 |
| **Real Estate** | 3.95 | 2.80 | 4.80 | 6.50 | 4.70 | -0.75 |
| **Consumer Defensive** | 3.34 | 2.85 | 1.67 | 2.02 | 2.18 | +1.16 |
| **Basic Materials** | 3.16 | 9.05 | 5.72 | 4.10 | 6.29 | -3.13 |
| **Utilities** | 2.47 | 0.00 | 3.33 | 2.34 | 1.89 | +0.58 |
| **Comm. Services** | 1.45 | 0.00 | 0.64 | 1.98 | 0.87 | +0.58 |

91. In every one of the eleven sectors, the difference between the U.S. SMid's allocation and the SMid Comparators' average is approximately 3.3 percentage points or less, and in eight of the eleven sectors it is less than three percentage points. The same sectors lead the way across the board: Industrials is the largest sector allocation for the U.S. SMid and for every SMid Comparator, and Industrials, Technology, and Financial Services are among the four largest sector allocations for the U.S. SMid and for every SMid Comparator. The U.S. SMid and the SMid Comparators are deploying their equity capital across the same segments of the economy, in similar proportions.

92. The style-box data confirms the same conclusion. The style map published in the U.S. SMid's official fact sheet shows the Fund's holdings concentrated exclusively in the Blend column of the style grid, spanning the Medium and Small capitalization rows, and the participant-facing style map on the Plan's Fidelity interface classifies the Fund as "Small Blend." The SMid Comparators occupy the same small/mid-capitalization band of the grid: TSMNX is classified by Morningstar as Small Blend, EISMX as Mid-Cap Blend, and PSCZX as Small Growth. That distribution—centered on Blend, spanning the small-to-mid capitalization range, with one growth-oriented member—mirrors the U.S. SMid's design (style-neutral, multi-manager portfolio that allocates across dedicated value, growth, and broad small/mid-cap sub-advisors). The U.S. SMid and the SMid Comparators invest in the same types of stocks, across the same capitalization range, in the same style spectrum.

93. The risk data completes the picture, and it does not support any suggestion that the U.S. SMid's underperformance reflects a more conservative posture. As set forth above, standard deviation measures the volatility—the risk—of a fund's returns. The U.S. SMid's standard deviation,

as displayed to Plan participants, is approximately 18.43—higher than every SMid Comparator's trailing three-year standard deviation (approximately 13.47 (Eaton Vance), 17.58 (PGIM), and 17.90 (Nuveen), an average of approximately 16.32).[19] On the sample standard deviation of the calendar-year returns pleaded in Table 2.b for 2017 through 2025—the years for which every fund has data—the U.S. SMid (approximately 16.80) sits inside the SMid Comparators' range (approximately 15.07 to 17.63) and above their average (approximately 16.25). The Fidelity interface also reports the U.S. SMid's beta at approximately 1.03 and its $R^2$ at approximately 0.99—the Fund moved in lockstep with its designated Russell 2500 benchmark. The U.S. SMid thus took at least as much risk as the SMid Comparators and its benchmark—while delivering less return than its designated benchmark over the trailing one-, three-, five-, and ten-year periods and since inception.

94. A fund that assumes equal or greater risk and delivers less return is underperforming. The comparability data above—asset allocation, geographic deployment, sector exposure, investment style, and risk—establishes that the SMid Comparators, together with the Fund's designated Russell 2500 benchmark (an index every SMid Comparator also designates or uses), provide a sound, like-for-like basis for evaluating the U.S. SMid's performance.

95. The SMid Comparators are particularly appropriate comparators in the context of a defined contribution retirement plan because they occupy the same role within a plan's investment lineup—namely, actively managed U.S. small/mid-cap equity options intended to provide participants with long-term equity strategies.

96. The SMid Comparators are all institutional share-class mutual funds that pursue materially similar mandates and invest in the same segment of the U.S. equity market as the U.S. SMid. Accordingly, the SMid Comparators represent meaningful peer funds against which a prudent fiduciary would evaluate whether the U.S. SMid delivered competitive performance and value for the Plan's participants. The returns compared in this Complaint are stated net of each fund's expenses,

[19] The U.S. SMid's volatility measures are as displayed to participants on the Plan's Fidelity NetBenefits interface as of June 30, 2026; the SMid Comparators' standard deviations are Morningstar's trailing three-year figures, as reported in August 2026.

so any difference in cost between the U.S. SMid and the SMid Comparators is already reflected in every performance figure that follows.

97. That the U.S. SMid is likewise a collective investment trust maintained within BFIT for the Plan—"an institutional collective investment trust, not a mutual fund," in the words of its fact sheet—while the SMid Comparators are institutional share classes of publicly offered mutual funds, does not undermine the comparison. The analysis above rests on the funds' actual portfolio compositions and the returns each fund delivered, which the vehicle does not change; Morningstar reports the same measures for collective investment trusts and mutual funds alike, and the Plan's Fidelity interface presents the U.S. SMid to participants on those measures beside the Mid-Cap Growth category average (¶ 82, *supra*).[20] The Russell 2500 Index and the SMid MS Benchmark are presented in Tables 2.a, 2.c, and 2.d as measures of comparative performance only; the comparator averages and the loss figures in this Complaint use the SMid Comparators.

98. Based on the similarities of the SMid Comparators' investment objectives, similar investment styles, portfolio construction approaches, and risks, the SMid Comparators represent meaningful comparators to the U.S. SMid. When combined with the Fund's designated benchmark (Russell 2500) and the SMid MS Benchmark, Plaintiffs have identified meaningful benchmarks that provide a sound basis of comparison to the U.S. SMid. Indeed, as demonstrated above, the U.S. SMid and the SMid Comparators hold similar asset allocations, deploy their equity in the same markets and the same sectors, occupy the same region of the Morningstar style grid, and carry comparable risk—comparable aims, comparable risks, and comparable potential rewards. *See also* Appendix A.

2. <u>The U.S. SMid's Chronic Underperformance</u>

99. As detailed below, the U.S. SMid has significantly underperformed both its designated benchmarks and its peer SMid Comparators on an annual basis, on a trailing 3-year, 5-year, and 10-year basis, and on a cumulative basis.

[20] Nor does the Fund's multi-manager construction distinguish it. Each of its sub-advisors manages a U.S. small- or mid-capitalization mandate, and the resulting portfolio is a single diversified U.S. small/mid-cap portfolio that its fact sheet places in the Blend column of the style grid and the Plan's Fidelity interface classifies as Small Blend.

100. The U.S. SMid's underperformance has undermined the retirement savings of participants in the Plan since at least 2019. Table 2.a below illustrates the U.S. SMid's performance as compared to its designated benchmarks based on: (i) yearly returns for the years 2015–2025; (ii) compounded annual differences over trailing three-year windows ending 2017–2025; (iii) trailing five-year windows ending 2019–2025; and (iv) trailing ten-year windows ending 2024–2025:

Table 2.a
**U.S. SMid**
Annual and 3-Year, 5-Year, and 10-Year Compounded Trailing Differences vs. SMid Prospectus Benchmark & SMid MS Benchmark[21]

| Fund / Bench | Annual Performance | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **US SMid** | -5.25 | 13.78 | 20.44 | -13.64 | 29.51 | 24.75 | 15.40 | -20.27 | 16.87 | 10.31 | 9.59 |
| Russell 2500 | -2.90 | 17.59 | 16.81 | -10.00 | 27.77 | 19.99 | 18.18 | -18.37 | 17.42 | 12.00 | 11.91 |
| *Alpha* | -2.35 | -3.81 | 3.63 | -3.64 | 1.74 | 4.76 | -2.78 | -1.90 | -0.55 | -1.69 | -2.32 |
| **Trailing 3** | - | - | -2.66 | -3.95 | 1.60 | 2.70 | 3.62 | -0.09 | -5.15 | -4.09 | -4.50 |
| **Trailing 5** | - | - | - | - | -4.57 | 2.38 | 3.47 | -2.05 | 1.09 | -2.32 | -8.92 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -6.78 | -6.75 |
| MS Bench | -0.95 | 6.03 | 23.91 | -6.65 | 32.52 | 39.26 | 13.05 | -27.79 | 21.37 | 16.47 | 7.67 |
| *Alpha* | -4.30 | 7.75 | -3.47 | -6.99 | -3.01 | -14.51 | 2.35 | 7.52 | -4.50 | -6.16 | 1.92 |
| **Trailing 3** | - | - | -0.46 | -3.26 | -12.92 | -22.88 | -15.13 | -5.92 | 5.09 | -3.64 | -8.66 |
| **Trailing 5** | - | - | - | - | -10.21 | -19.79 | -23.81 | -15.13 | -12.86 | -15.69 | 0.51 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -24.29 | -19.37 |

101. Table 2.b below illustrates the U.S. SMid's underperformance as compared to the SMid Comparators based on: (i) yearly returns for the years 2015–2025; (ii) compounded annual

[21] While the U.S. SMid outperformed the Russell 2500 Index in 2019 and 2020, beginning in 2021, the Fund underperformed the Russell 2500 Index in five consecutive calendar years—2021 through 2025. As of December 31, 2024, the Fund had underperformed the Russell 2500 Index over every trailing annual period reported in its fact sheet: the trailing one-year period (10.3% vs. 12.0%), the trailing three-year period (0.9% vs. 2.4% annualized), the trailing five-year period (8.2% vs. 8.8% annualized), the trailing seven-year period (7.5% vs. 8.3% annualized), and the period since November 1, 2015, the first full month after the Fund's October 12, 2015 inception (9.0% vs. 9.8% annualized). The Fund's full calendar-year 2025 return (9.59%) again trailed the Russell 2500 Index (11.91%), and as of June 30, 2026, the Fund trailed the Russell 2500 Index over the trailing one-, three-, five-, and ten-year periods and since inception, per the Plan's participant-facing disclosures. In other words, a participant invested since the Fund's 2015 inception has earned less—over every trailing period of one year or longer ending on the date of those disclosures—than the Fund's designated benchmark returned.

differences over trailing three-year windows ending 2017–2025; (iii) trailing five-year windows ending 2019–2025; and (iv) trailing ten-year windows ending 2024–2025:

Table 2.b
**U.S. SMid**
Annual and 3-Year, 5-Year, and 10-Year Compounded Trailing Differences vs. SMid Comparators

| **Fund** | **Annual Performance** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** |
| **U.S. SMid** | -5.25 | 13.78 | 20.44 | -13.64 | 29.51 | 24.75 | 15.40 | -20.27 | 16.87 | 10.31 | 9.59 |
| EISMX | 9.75 | 11.21 | 24.73 | -5.35 | 34.44 | 11.24 | 22.25 | -8.81 | 14.01 | 13.62 | -5.64 |
| PSCZX | -3.55 | 13.57 | 19.68 | -13.18 | 28.80 | 27.58 | 29.40 | -18.62 | 11.85 | 14.05 | 7.22 |
| TSMNX | N/A | N/A | 19.65 | -7.40 | 29.91 | 15.89 | 31.84 | -16.53 | 20.81 | 18.24 | 16.11 |
| *Delta* | -8.35 | 1.39 | -0.91 | -5.00 | -1.54 | 6.51 | -12.43 | -5.62 | 1.31 | -4.99 | 3.69 |
| **Trailing 3** | - | - | -7.92 | -4.56 | -7.31 | -0.37 | -8.16 | -11.97 | -16.26 | -9.15 | -0.19 |
| **Trailing 5** | - | - | - | - | -13.87 | 0.10 | -13.55 | -17.65 | -12.18 | -15.26 | -17.51 |
| **Trailing 10** | - | - | - | - | - | - | - | - | - | -27.02 | -17.43 |

102. Table 2.c below illustrates the U.S. SMid's cumulative compounded performance as compared to the SMid Comparators and its designated benchmarks:

Table 2.c
**U.S. SMid**
Cumulative Compounded Performance vs. the SMid Comparators, SMid Prospectus Benchmark & SMid MS Benchmark

| **Fund / Benchmark** | **Cumulative Compounded Performance 2015–2025** | |
|---|---|---|
| | Cumulative Compound Performance | Underperformance vs. Comparator |
| **U.S. SMid** | 135.50 | N/A |
| EISMX | 193.64 | -58.14 |
| PSCZX | 169.38 | -33.88 |
| ***Comparator Average*** | 181.51 | -46.01[22] |
| Russell 2500 | 161.28 | -25.78 |
| MS Bench | 178.55 | -43.05 |

[22] The U.S. SMid similarly underperformed on a cumulative compound basis by approximately -45.20 as compared to the average performance of all three SMid Comparators (including TSMNX, which lacks full 2015–2016 data) for the period covering 2017–2025.

103. The pattern against the SMid Comparators is similar in the heart of the Class Period. Table 2.d below states the record comparator by comparator, in the form of Table 1.d, over the eighteen trailing windows computable from the returns pleaded in Tables 2.a and 2.b and the fourteen ending in the Class Period (twelve and eleven for TSMNX, whose pleaded returns begin in 2017). On every trailing three-, five-, and ten-year window ending at year-end 2022, 2023, and 2024—twenty fund-against-comparator windows in all—every SMid Comparator outperformed the U.S. SMid. Over the eighteen computable windows, the SMid Comparators' average outperformed the Fund on seventeen, EISMX on sixteen, and PSCZX on fifteen; TSMNX—an actively managed fund benchmarked, like the U.S. SMid, to the Russell 2500 Index—outperformed it on eleven of the twelve windows computable from the data in Table 2.b, including every window ending in the years 2021 through 2025. As of December 31, 2025, every SMid Comparator and their average are ahead of the Fund on every computable trailing five- and ten-year window—approximately -17.51 and -17.43 against the Comparators' average (Table 2.b).

Table 2.d
**U.S. SMid**
Trailing 3-Year, 5-Year, and 10-Year Compounded Annual Differences as of December 31, 2025, and Windows Underperformed, vs. SMid Comparators, Comparator Average, and Each Benchmark

| Comparator / Benchmark | Trailing 3 (2025) | Trailing 5 (2025) | Trailing 10 (2025) | Windows underperformed | Windows underperformed (20–25) |
|---|---|---|---|---|---|
| EISMX | 14.60 | -5.48 | -8.17 | 16 of 18 | 12 of 14 |
| PSCZX | 3.49 | -12.47 | -13.91 | 15 of 18 | 13 of 14 |
| TSMNX | -17.32 | -33.50 | N/A | 11 of 12 | 10 of 11 |
| ***Comparator Average*** | -0.19 | -17.51 | -17.43 | 17 of 18 | 13 of 14 |
| Russell 2500 | -4.50 | -8.92 | -6.75 | 12 of 18 | 9 of 14 |
| MS Bench | -8.66 | 0.51 | -19.37 | 16 of 18 | 12 of 14 |

104. The assets in the U.S. SMid have an approximate value of $475.8 million (as of December 31, 2025). Assuming, for illustrative purposes only, that the approximately $475.8 million in assets reflects compound growth on a single starting principal, and given that the U.S. SMid produced cumulative compounded growth of 135.50% from 2015 through 2025, the original amount in 2015 would have been approximately $202 million. Had $202 million been invested in one of the SMid Comparators, its value as of December 31, 2025, would have been, on average, approximately $569 million (or an increase in value for participants of approximately $93 million). That illustration

measures the shortfall over the full period of the pleaded returns. The losses Plaintiffs seek to recover, measured from the first full calendar year of the Class Period, are set out in Table 3 below.

105. The foregoing return, trailing return, and cumulative performance information is the information Defendants would have had available had they conducted a simple analysis evaluating the U.S. SMid and compared its performance to any of the SMid Comparators, or even its designated benchmark.

106. A prudent fiduciary monitoring the U.S. SMid's performance would have compared its returns to one or more of the SMid Comparators identified in Tables 2.b and 2.c or, at minimum, to its prospectus benchmark and the additional Morningstar Category benchmark identified in participant-facing disclosures.

107. When considering whether to retain a U.S. small/mid-cap equity fund in a plan, a prudent fiduciary would evaluate the fund's risk and return characteristics as compared to the entire universe of comparable funds available based on qualitative and quantitative metrics. A prudent fiduciary could not have reasonably concluded that retention of the U.S. SMid was appropriate for the Plan.

**D. The Subject Funds Were Embedded in the Plan's Birth Date Funds, Magnifying the Harm**

108. Each of the Plan's twelve Birth Date Funds—operated by SEI Trust Company and serving as the Plan's default investment for automatically enrolled participants—incorporates the U.S. Large Cap and the U.S. SMid as components providing underlying U.S. equity exposure. The Plan's annual fee disclosure identifies the U.S. Large Cap Equity Fund and the U.S. Small/Mid Cap Equity Fund among the investments within each Birth Date Fund.

109. The Birth Date Funds collectively held approximately $2.52 billion in Plan assets as of December 31, 2025. Every dollar of that allocation that flowed through the U.S. Large Cap or the U.S. SMid was exposed to the same underperformance described above.

110. As a result, the harm caused by Defendants' failure to remove the Subject Funds extends beyond participants who directly selected the Subject Funds and reaches participants who invested in any Birth Date Fund during the Class Period.

### E. Defendants Caused the Plan to Engage in Prohibited Transactions with a Party in Interest

111. In addition to imprudently retaining the Subject Funds, Defendants caused the Plan to engage in transactions prohibited by 29 U.S.C. § 1106(a)(1). As set forth above (¶¶ 47–49), § 1106(a)(1) bars a fiduciary from causing the plan to engage in the furnishing of services between the plan and a party in interest, or the transfer of plan assets to a party in interest, and a plan's service providers are parties in interest. A plan's payments to its recordkeeper and to the managers of its investments are therefore transactions within the statute. Under *Cunningham*, 604 U.S. at 700–02, a plaintiff states a prima facie claim by alleging those transactions; whether an arrangement was reasonable and the services necessary is an exemption under 29 U.S.C. § 1108(b)(2)(A) that Defendants bear the burden of pleading and proving.

112. Fidelity is a "party in interest" under 29 U.S.C. § 1002(14)(B) because it provides recordkeeping, participant communication, and related administrative services to the Plan.

113. Throughout the Class Period, Defendants caused the Plan to compensate Fidelity for those services with plan-asset-derived compensation, including: (i) direct compensation paid by the Plan (approximately $833,246 for the 2024 plan year and approximately $522,161 for the 2025 plan year); (ii) fixed per-participant recordkeeping fees—$34 per participant per year, per the Plan's audited financial statements and its participant fee disclosure—deducted quarterly from participants' accounts; and (iii) indirect compensation, including sub-transfer-agency fees that Fidelity receives from the Plan's investment providers in connection with Plan investments.

114. The Plan's audited financial statements further disclose that "[t]he Plan has a revenue-sharing agreement whereby certain investment managers return a portion of the investment fees to the trustee to offset the Plan's administrative fees." The Plan's summary plan description describes a related mechanism under which the Plan's administrative expenses may be paid from "revenue-sharing payments provided to the plan by the plan's recordkeeper pursuant to its services contract with the plan, in recognition of the 'revenue sharing' or other payments that the plan's recordkeeper receives from some or all of the plan's investment providers (or their affiliates) in connection with plan investments."

115. The amounts flowing through the Plan's revenue-sharing arrangements are substantial. The Plan's audited financial statements report that revenue-sharing amounts that investment managers returned to the Plan's trustee, and that were used to offset Plan expenses, were approximately $697,000 for 2021, approximately $517,000 for 2022, approximately $320,000 for 2023, approximately $706,000 for 2024, and approximately $975,000 for 2025—more than $3.2 million over the last five reported plan years alone.

116. Each of the Plan's recordkeeping and revenue-sharing arrangements described above constitutes the direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest," 29 U.S.C. § 1106(a)(1)(C), and the direct or indirect "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan," 29 U.S.C. § 1106(a)(1)(D). Defendants, as the Plan's fiduciaries, caused the Plan to engage in these transactions and knew or should have known that the transactions constituted the furnishing of services between the Plan and a party in interest and the transfer of Plan assets to a party in interest.

117. These transactions injured the Plan and its participants, including Plaintiffs. The per-participant recordkeeping fees were deducted directly from participants' individual accounts—Plaintiff O'Hara's account statements, for example, itemize "Administrative Fees" deducted from his balances in the Plan investment options he held, including the U.S. Large Cap and the U.S. SMid—and the statements themselves disclose that "[s]ome of the administrative services performed for the Plan were underwritten from the total operating expenses of the Plan's investment options." The indirect compensation Fidelity received likewise derived from the Plan's investments. Each such charge and payment reduced participants' individual account balances and the Plan's assets.

118. Defendants also caused the Plan and its participants to pay investment management fees, throughout the Class Period, to the parties in interest that provide services to the Subject Funds. The U.S. Large Cap carried a net expense ratio of 0.33% per year (0.35% gross) and the U.S. SMid a net expense ratio of 0.48% per year (0.54% gross), per the Funds' December 31, 2024 fact sheets and the Plan's January 27, 2025 annual fee disclosure. Those fees are deducted from the Funds' assets—Plan assets—and paid, directly or indirectly, to the Funds' trustee, investment adviser, and sub-

advisers, each of which provides services in connection with the Plan's investments and is a party in interest. The fact sheets state that each Fund's net expense ratio "includes fees held for plan administration expenses such as consultants, audits and other administrative costs," and estimate the impact of those expenses at 0.0045%. Applied to the Subject Funds' balances as of December 31, 2025 ($2,051,603,120 and $475,827,714), those expense ratios amount to approximately $9.1 million to $9.8 million per year.

119. The Plan's filings disclose further transfers of Plan assets to parties in interest—including to HP itself. The Plan's Form 5500 Schedule C filings report direct compensation paid by the Plan to HP, identified as the Plan's "Plan Administrator": approximately $150,997 for the 2022 plan year, $254,393 for 2023, $280,415 for 2024, and $287,483 for 2025—more than $970,000 over the last four reported plan years alone.

120. The Plan's filings also disclose transactions that the filings themselves classify as prohibited. The Plan's audited financial statements for the 2024 plan year disclose, under the heading "Nonexempt Party-In-Interest Transactions," that HP remitted certain 2018–2024 participant contributions—$278,542 in total—to the trustee later than required by DOL Regulation 2510.3-102 (29 C.F.R. § 2510.3-102), and that HP "made the appropriate corrections in 2024 and paid the amount of investment income that would have been earned had the participant contributions been remitted on a timely basis." The accompanying Schedule H schedule of delinquent participant contributions itemizes, under the heading "Total That Constitutes Nonexempt Prohibited Transactions," late-remitted participant contributions for each of seven consecutive years—$89,493 (2018), $76,728 (2019), $89,857 (2020), $2,316 (2021), $5,483 (2022), $9,516 (2023), and $5,149 (2024)—each corrected outside the Department of Labor's Voluntary Fiduciary Correction Program. The Plan's filing for the 2020 plan year had likewise reported late-remitted 2019 and 2020 participant contributions as nonexempt prohibited transactions, and stated that "[a] Form 5330"—the return on which the excise tax on prohibited transactions under 26 U.S.C. § 4975 is reported—was "in the process of being filed in 2021." The Plan's filing for the 2025 plan year reports no further late remittances.

121. An employer's retention of withheld participant contributions beyond the period permitted by DOL Regulation 2510.3-102 is a use of Plan assets by and for the benefit of the sponsor, and each late remittance was a transaction prohibited by 29 U.S.C. § 1106(a)(1)(D) and § 1106(b)(1). That the Plan's filings report the transactions as corrected—years later, with lost earnings restored—confirms the violations. And the chronology those filings disclose—delinquencies from 2018 through 2020 totaling more than $256,000 that the Plan's filing for the 2024 plan year reports as corrected in 2024, and a filing for the 2020 plan year that had reported late-remitted contributions of $173 for 2019 and $29,196 for 2020—is itself evidence of the absence of an effective fiduciary process for monitoring the handling of participants' retirement contributions.

122. Under *Cunningham*, 604 U.S. at 700–02, the foregoing allegations state a *prima facie* claim under § 1106(a)(1)(C). The same rule governs the § 1106(a)(1)(D) claim, because § 1108's exemptions are affirmative defenses to any transaction § 1106 prohibits, and the burden of pleading and proving them—including the exemption under 29 U.S.C. § 1108(b)(2)(A) for reasonable arrangements with parties in interest for necessary services—rests on the Defendants. The transactions in which HP itself received or retained Plan assets also state a claim under § 1106(b)(1), which the § 1108(b)(2)(A) exemption does not reach. *See* 29 C.F.R. § 2550.408b-2(a).

### F. Defendants Violated Their ERISA Fiduciary Duties by Failing to Timely Remove the Consistently Underperforming Subject Funds

123. Each of the Defendants is, or during the Class Period was, a fiduciary of the Plan under ERISA. Accordingly, Defendants were obligated to vigorously and independently investigate the merits of each of the investment options available to the Plan, using prudent methods in conducting such investigation. 29 U.S.C. § 1104(a)(1)(B).

124. Defendants selected the U.S. Large Cap and the U.S. SMid as investment options in the Plan in approximately 2015. Since the Subject Funds were included as options, Defendants have encouraged participants to invest in them—as evidenced by, *inter alia*, (i) the U.S. Large Cap being the only actively managed multi-manager U.S. large-capitalization option in the Plan's designated menu; (ii) the U.S. SMid being the only actively managed multi-manager U.S. small/mid-capitalization option in the Plan's designated menu; (iii) the Subject Funds being embedded as

components within each of the Plan's twelve Birth Date Funds—the Plan's default investment; and (iv) the Subject Funds collectively representing approximately $2.53 billion, or approximately 23.3%, of the Plan's total assets.

125. Post-selection, as fiduciaries of the Plan, Defendants were responsible for monitoring the Subject Funds' performance with the skill of a prudent expert to determine whether their investment performance was in line with a meaningful investment index and funds within a recognized peer universe.

126. Prudent fiduciaries of large defined-contribution plans monitor plan investments through periodic—typically quarterly—reviews that evaluate each option's trailing three-, five-, and ten-year returns against its designated benchmark and a recognized peer universe, because those trailing windows are the information available to a monitoring fiduciary in real time. They are likewise the presentation on the Subject Funds' fact sheets, which print trailing one-, three-, five-, and seven-year and since-inception returns beside the designated benchmark, and on the Plan's participant-facing Fidelity interface—which prints each Subject Fund's trailing one-, three-, five-, and ten-year and life-of-fund returns beside its designated benchmark, and prints year-by-year "+/-" differential rows measuring each Fund against both its designated benchmark and its assigned Morningstar category average. The trailing-window figures pleaded in this Complaint, and the trailing returns printed on those disclosures at each review date, are the figures Defendants' monitoring process was required to confront at each successive review. The cumulative figures measure the aggregate cost of the failure to act on them.

127. As demonstrated, (i) the U.S. Large Cap has underperformed the benchmark designated in its fact sheet (the Russell 1000 Index) in nine of the eleven calendar years from 2015 through 2025, and underperformed its prospectus benchmark or peer benchmarks on a trailing three-year basis for six consecutive years (2020–2025), a trailing five-year basis for seven consecutive years (2019–2025), and a trailing ten-year basis for two consecutive years (2024–2025), and on a cumulative basis; and (ii) the U.S. SMid has underperformed the benchmark designated in its fact sheet (the Russell 2500 Index) in eight of the eleven calendar years from 2015 through 2025, and

underperformed its peer benchmark (the average of the SMid Comparators) on a trailing three-year basis (the compounded trailing measure stated in Table 2.b and described in ¶ 73) for nine consecutive years (2017–2025), on a trailing five-year basis for five consecutive years (2021–2025), and a trailing ten-year basis for two consecutive years (2024–2025), and on a cumulative basis.

128. For example, if participants invested in the Subject Funds had invested their funds in one of the corresponding Comparators in or around 2015, by December 31, 2025, those same amounts would have made, on average, approximately $317 million more than those same funds made invested in the Subject Funds.[23] Had Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have seen in real-time that the Subject Funds underperformed their benchmarks and comparators.

129. The losses Plaintiffs seek to recover are measured over the complete calendar years of the Class Period. Had the amounts participants invested in the Subject Funds instead been invested in the corresponding Comparators from January 1, 2021, those amounts would have earned, on average, approximately $313 million more than they earned in the Subject Funds through December 31, 2025, and approximately $480 million more measured against the strongest-performing Comparator for each Subject Fund. Table 3 sets out the computation, by the method of the illustrations at ¶¶ 77 and 104. The figures are conservative: they exclude the Subject Funds' underperformance before 2021, and, through June 30, 2026, both Subject Funds continued to trail their designated benchmarks (8.43% versus 10.32% and 20.09% versus 22.71% year to date, per the Plan's Fidelity interface).

[23] This figure aggregates the computations for the U.S. Large Cap (approximately $224 million) and the U.S. SMid (approximately $93 million), detailed *supra*.

Table 3
**U.S. Large Cap and U.S. SMid**
Losses to the Plan over the Complete Calendar Years of the Class Period (2021–2025) vs. the Comparator Average and the Strongest Comparator[24]

| Subject Fund (window) | Assets as of Dec. 31, 2025 | Fund return (%) | Comparator average return (%) | Loss vs. average | Strongest Comparator (return, %) | Loss vs. strongest Comparator |
|---|---|---|---|---|---|---|
| **U.S. LC (21–25)** | 2,051.6 | 77.48 | 96.88 | 224.2 | JLPSX (102.38) | 287.8 |
| **U.S. SMid (21–25)** | 475.8 | 29.99 | 54.27 | 88.9 | TSMNX (82.52) | 192.3 |
| **Total** | 2,527.4 | - | - | 313.1 | - | 480.1 |

130. The Defendants' decision to retain the Subject Funds was as imprudent as it was injurious to the Plan and its participants. Year after year of underperformance against the Subject Funds' designated benchmarks—and against every meaningful peer—is difficult, if not impossible, to justify.

131. Defendants breached their fiduciary duty of prudence by retaining the Subject Funds—resulting in a devastating impact on Plaintiffs' and their fellow participants' retirement accounts, simultaneously impairing the Plan's overall investment performance and wasting hundreds of millions of dollars in retirement savings.

132. Any fiduciary would have seen that the poor performance of the Subject Funds warranted the selection of new actively managed U.S. large-cap and small/mid-cap options. The Plan is large, in terms of both the number of participants (approximately 31,782 participants with account balances) and the amount of assets under management (approximately $10.85 billion). Due to its size, HP has access to the largest and best investment managers and, had Defendants replaced the Subject Funds, they would have done so with funds offered by the largest, and most-established known operators of U.S. large-cap and small/mid-cap equity funds.

133. Defendants had every resource necessary to conduct that monitoring. The Plan retained—and paid from Plan assets—a professional benefits consulting firm, at $200,000 in direct compensation for each of the 2022 through 2025 plan years, as reported on the Plan's Form 5500 Schedule C filings. The Subject Funds themselves were advised by Callan, one of the largest

24 The assets and loss figures in this table are represented in $ millions.

independently-owned investment management and consulting firms in the United States, whose advice participants were already paying for through the Funds' expense ratios. And the underperformance was on the face of the participant disclosures the Plan itself distributed: as of December 31, 2024 on the Funds' fact sheets, and as of June 30, 2026 on the Plan's Fidelity interface, the Subject Funds trailed their designated benchmarks over every reported trailing period of one year or longer.

134. The Defendants' breaches have had a profound adverse effect on the Plan and its participants. The overall breadth and depth of the Subject Funds' underperformance raise a plausible inference that Defendants' selection and monitoring process with respect to the Subject Funds was tainted by either a lack of competency, a complete failure of effort, or some combination of the above.

## CLASS ACTION ALLEGATIONS

135. Plaintiffs bring this action as a class action on behalf of all participants and beneficiaries of the Plan pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2) and/or (b)(3). Specifically, Plaintiffs bring this action on behalf of:

> All participants and beneficiaries of the Plan who, from October 7, 2020 through the date of judgment, invested in one or more of the:
>
> i. U.S. Large Cap Equity Fund; and
>
> ii. U.S. Small/Mid Cap Equity Fund,
>
> whether held directly or as a component of a Birth Date Fund.
>
> The Class excludes Defendants, any officers, directors, agents, or employees of Defendants, at all relevant times, with responsibility for the Plan's investment or administrative functions, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

136. This action may be certified as a Class under Rule 23(a)(1) as the members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are tens of thousands of members of the proposed Class. Members of the Class may be identified from records maintained by HP and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

137. Plaintiffs' claims are typical of the claims of the members of the Class as each Plaintiff was a participant during the Class Period and all participants in the Plan were harmed by Defendants' misconduct.

138. Plaintiffs will fairly and adequately protect the interests of the members of the Class as they each participated in the Plan during the Class Period, are committed to vigorous representation of the Class, and have retained counsel competent and experienced in class litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

139. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class because Defendants owed the same fiduciary duties to the Plan and all participants and beneficiaries and took a common course of conduct as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Among the questions of law and fact common to the Class are:

a. whether each of the Defendants is a fiduciary liable for the remedies provided by 29 U.S.C. § 1109(a);

b. whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating the Plan's investment options;

c. whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by failing to employ a prudent process for monitoring and evaluating the Plan's investment performance and strategy;

d. whether the Plan's recordkeeping and revenue-sharing arrangements with Fidelity, the investment management fees paid in connection with the Subject Funds, the payments of Plan assets to HP, and HP's late remittance of participant

contributions constitute prohibited transactions under 29 U.S.C. § 1106(a)(1) and (b)(1);

e. whether Plaintiffs' claims of an imprudent process require similar inquiries and proof of the claims and therefore implicate the same set of concerns for all proposed members of the Class;

f. what are the losses to the Plan resulting from each breach of fiduciary duty;

g. what Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duties; and

h. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

140. Certification under Rule 23(b)(1) is appropriate as prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

141. Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. Plaintiffs seek reformation of the Plan to include more viable retirement investment options, which will benefit the Plan and other participants in the Plan.

142. Additionally, or in the alternative, this action may be certified as a Class under Rule 23(b)(3) as questions of law or fact common to members of the Class predominate over any questions

affecting individual members of the Class, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

## CAUSES OF ACTION

### COUNT I

### Breach of Duty of Prudence for Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time

### (Violation of ERISA, 29 U.S.C. § 1104)

### (Against All Defendants)

143. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

144. HP used the Plan as a strategic and financial benefit to recruit and retain workers.

145. In joining HP and subsequently enrolling in the Plan, employees trusted and relied on HP's resources and expertise to construct and maintain a state-of-the-art retirement plan.

146. At all relevant times during the Class Period, Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets.

147. 29 U.S.C. § 1104(a)(1)(B) requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

148. Thus, the scope of the fiduciary duties and responsibilities of Defendants includes administering the Plan with the care, skill, diligence, and prudence required by ERISA. Defendants are responsible for evaluating and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

149. Defendants breached their fiduciary duties by adopting an imprudent process for evaluating and monitoring investment options in the Plan. The faulty process resulted in the Plan's inclusion of two imprudent funds, a large-capitalization fund (the U.S. Large Cap) and a small/mid-capitalization fund (the U.S. SMid)—both of which exhibited chronic poor performance against their

designated benchmarks and against meaningful peer comparators. That process is manifest in three decisions. First, Defendants retained the U.S. Large Cap after it had fallen behind the average of the Large Cap Comparators on both the three- and five-year trailing windows (as measured in Tables 1.a and 1.b) at year-end 2021 and every year-end since, and behind its designated Russell 1000 benchmark on both windows at year-end 2020 and every year-end since. Second, Defendants retained the U.S. SMid after it had fallen behind the average of the SMid Comparators on every three-year trailing window (as measured in Table 2.b) from year-end 2017 and on both the three- and five-year windows at year-end 2021 and every year-end since. Third, Defendants kept both Subject Funds throughout the Class Period as the U.S. equity building blocks of the twelve Birth Date Funds, the Plan's default investment, so that the underperformance reached participants who never selected either Fund.

150. By failing to adequately consider better-performing investment products for the Plan, Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

151. Defendants' breaches of fiduciary duty have substantially impaired the Plan's value and investment performance for all Class members.

152. As a direct and proximate result of Defendants' breaches of fiduciary duty, the Plan and its participants have suffered more than $300 million of damages and lost-opportunity costs, which continue to accrue—approximately $313 million measured over the complete calendar years of the Class Period against the Comparators' averages, and approximately $480 million measured against the strongest-performing Comparator for each Subject Fund (Table 3)—and for which Defendants are jointly and severally liable pursuant to 29 U.S.C. §§ 1132(a)(2), 1132(a)(3), and 1109(a).

153. Each of the Defendants is liable to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

154. Each Defendant also participated in the breach of the other Defendants, knowing that such acts were a breach, and enabled the other Defendants to commit a breach by failing to lawfully discharge its fiduciary duties. Each Defendant knew of the breach by the other Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary duties under 29 U.S.C. § 1105(a).

**COUNT II**
**Engaging in Prohibited Transactions With a Party in Interest**
**(Violation of ERISA, 29 U.S.C. §§ 1106(a)(1)(C)–(D), 1106(b)(1))**
**(Against All Defendants)**

155. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

156. ERISA's prohibited-transaction provisions impose categorical bars on certain dealings between a plan and a "party in interest." 29 U.S.C. § 1106(a)(1) provides that a fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect…(C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

157. Fidelity is a "party in interest" within the meaning of 29 U.S.C. § 1002(14)(B) because it provides services to the Plan.

158. Throughout the Class Period, Defendants caused the Plan to engage in transactions prohibited by § 1106(a)(1)(C) and (D) by entering into and maintaining recordkeeping and revenue-sharing arrangements under which Fidelity furnished recordkeeping, participant communication, and related administrative services to the Plan in exchange for plan-asset-derived compensation—including direct compensation paid by the Plan, fixed per-participant fees deducted from participants' accounts, and indirect compensation, including sub-transfer-agency fees and revenue-sharing payments received in connection with the Plan's investments.

159. The amounts flowing through these arrangements were substantial, including approximately $833,246 in direct compensation for the 2024 plan year and approximately $522,161

for the 2025 plan year. The Plan's audited financial statements further report that investment managers returned to the Plan's trustee, to offset the Plan's administrative expenses, revenue-sharing amounts of approximately $697,000 (2021), $517,000 (2022), $320,000 (2023), $706,000 (2024), and $975,000 (2025).

160. Throughout the Class Period, Defendants also caused the Plan and its participants to pay investment management fees and expenses in connection with the Subject Funds—the U.S. Large Cap's net expense ratio of 0.33% per year (0.35% gross) and the U.S. SMid's net expense ratio of 0.48% per year (0.54% gross), per the Funds' December 31, 2024 fact sheets and the Plan's January 27, 2025 annual fee disclosure—paid, directly or indirectly, from Plan assets to parties in interest, including the Subject Funds' trustee, investment adviser, and sub-advisers. Each such payment was a separate transaction prohibited by 29 U.S.C. § 1106(a)(1)(C) and (D). Although Plaintiffs need not plead it, in light of the Subject Funds' sustained underperformance those payments also constituted more than reasonable compensation for the services provided.

161. In addition, as alleged *supra*, the Plan's filings disclose that the Plan paid direct compensation to HP itself—approximately $970,000 over the 2022 through 2025 plan years—and that HP retained withheld participant contributions beyond the period permitted by DOL regulation in each year from 2018 through 2024, late remittances the Plan's filings themselves classify as "nonexempt" prohibited transactions. Each such transaction constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest of assets of the Plan, in violation of 29 U.S.C. § 1106(a)(1)(D), and each use of Plan assets by or for the benefit of HP itself likewise violated 29 U.S.C. § 1106(b)(1).

162. Pursuant to *Cunningham*, 604 U.S. at 700–02, the foregoing allegations are sufficient to state a *prima facie* claim under § 1106(a)(1)(C). The same rule governs the § 1106(a)(1)(D) claim, because § 1108's exemptions are affirmative defenses to any transaction § 1106 prohibits, and the burden of pleading and proving them—including the exemption under 29 U.S.C. § 1108(b)(2)(A) for reasonable arrangements with parties in interest for necessary services—rests on the Defendants. The

transactions in which HP itself received or retained Plan assets also state a claim under § 1106(b)(1), which the § 1108(b)(2)(A) exemption does not reach. *See* 29 C.F.R. § 2550.408b-2(a).

163. The foregoing transactions injured the Plan and its participants, including Plaintiffs, whose individual accounts bore the per-participant recordkeeping charges. Section 1132(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008).

164. Defendants are personally liable to make good to the Plan the losses resulting from the prohibited transactions, including compensation paid from Plan assets to parties in interest, and to restore to the Plan any profits Defendants made through the use of Plan assets, 29 U.S.C. § 1109(a), and are subject to such other equitable relief as § 1132(a)(3) permits, including surcharge.

**COUNT III**
**Failure to Monitor**
**(Against All Defendants)**

165. All allegations set forth in the Complaint are realleged and incorporated herein by reference.

166. Defendants had a duty to monitor the performance of each individual to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of the Plan's assets, and must take prompt and effective action to protect the Plan and participants when they are not.

167. To the extent any Defendant's fiduciary responsibilities were delegated to another fiduciary, such Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

168. Defendants breached their fiduciary monitoring duties by, among other things:

a. failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions with respect to the Plan;

b. failing to monitor their appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

c. failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that the investment options were prudent;

d. failing to monitor their appointees' decisions to cause the Plan to engage in the prohibited transactions described above; and

e. failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options and prohibited transactions to remain in the Plan to the detriment of the Plan's participants' retirement savings.

169. Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

a. failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions with respect to the Plan;

b. failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the imprudent investment options in violation of ERISA;

c. failing to implement a process to ensure that the appointees monitored the performance of Plan investments; and

d. failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

170. As a direct result of these breaches of the fiduciary duty to monitor, the Plan has suffered substantial losses. Had HP and the other delegating fiduciaries prudently discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

(a) find and adjudge that Defendants have breached their fiduciary duties, as described above;

(b) find and adjudge that Defendants caused the Plan to engage in transactions prohibited by 29 U.S.C. § 1106;

(c) find and adjudge that Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

(d) find and adjudge that Defendants are liable to the Plan for appropriate equitable relief, including but not limited to restitution and disgorgement;

(e) determine the method by which the Plan's losses under 29 U.S.C. § 1109(a) should be calculated;

(f) order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

(g) remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

(h) impose a surcharge against Defendants and in favor of the Plan to make good the losses resulting from, and to disgorge any profits obtained through, the prohibited transactions;

(i) reform the Plan to include only prudent investments and to eliminate any prohibited transactions;

(j) certify the Class, appoint Plaintiffs as class representatives, and appoint Kahn Swick & Foti, LLC as Class Counsel;

(k) award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(l) order Defendants to pay interest to the extent allowed by law; and

(m) grant such other equitable or remedial relief as the Court deems appropriate.

Dated: October 7, 2026 Respectfully submitted,

By: */s/ Kim E. Miller*
Kim E. Miller (SBN 264409)
**KAHN SWICK & FOTI, LLP**
1901 Avenue of the Stars, 2nd Floor
Los Angeles, CA 90067
Telephone: (212) 696-3732
Email: kim.miller@ksfcounsel.com

– AND –

Melinda A. Nicholson*
John A. Carriel*
Alayne Gobeille (SBN 368436)
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 648-1842
Facsimile: (504) 455-1498
Email: melinda.nicholson@ksfcounsel.com
Email: john.carriel@ksfcounsel.com
Email: alayne.gobeille@ksfcounsel.com

*Attorneys for Plaintiffs, the Plan, and the Proposed Class*

**Pro hac vice* application forthcoming